STEVEN MICHAEL WEINBERG AND COURTNEY PLUMMER[1] WEINBERG, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 760-72. Filed August 4, 1975.

*Cyril David Kasmir,* for the petitioners.
*Kemble White,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Year | Petitioner | Amount |
| --- | --- | --- |
| 1968 | Steven Michael Weinberg_____ | $2,376.51 |
| 1969 | Steven Michael Weinberg_____ | 417.78 |
| 1969 | Courtney Plummer Weinberg _____ | 417.78 |

The issues to be decided are: (1) Whether any of the amounts paid to the petitioner Steven Michael Weinberg in 1968 and 1969 by several hospitals in which he served as an intern and resident was excludable from gross income as a scholarship or fellowship grant under section 117 of the Internal Revenue Code of 1954; [1] and (2) whether additional cash allowances paid to him for meals and lodging by Parkland Memorial Hospital during 1968 and 1969 were excludable from income under section 119, relating to meals or lodging furnished for the convenience of the employer.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Dr. Steven Michael and Courtney Plummer Weinberg, were married in 1969 and maintained their residence in Dallas, Tex., at the time of filing their petition herein. He filed his individual Federal income tax return for the year 1968 with the District Director of Internal Revenue, Dallas, Tex. They filed individual returns for 1969 with the District Director of Internal Revenue, Dallas, Tex. Dr. Weinberg will sometimes be referred to as the petitioner.[2]

Dr. Weinberg was graduated from the Iowa Medical School in June 1967. He received his license to practice medicine in Iowa in 1968 and his license to practice in Texas in 1970.

---

[1] All statutory references are to the Internal Revenue Code of 1954.
[2] Mrs. Weinberg is a party to this proceeding solely by virtue of receiving community property income from her husband in 1969.

From July 1, 1967, through June 30, 1968, Dr. Weinberg was a rotating intern at the University of Texas Southwestern Medical School (the university) in Dallas, Tex. From July 1, 1968, through June 30, 1972, he was a resident at the university specializing in general surgery. The university coordinated internship and residency training programs with hospitals in the Dallas area. Interns and residents were often rotated through several hospitals. Dr. Weinberg worked chiefly at Parkland Memorial Hospital (Parkland), which is the primary teaching facility of the university. He also worked at Presbyterian Hospital (Presbyterian) and Veterans Administration Hospital (Veterans) in Dallas. The internship and residency were required for Dr. Weinberg to be licensed to practice medicine and certified by the American Board of Surgery.

Parkland was one of two hospitals operated by the Dallas County Hospital District (the district). The permanent staff of the district was composed of the members of the faculty of the university. The chairman of a particular service within the university served as the chairman of that service in the district and directed, supervised, and controlled that service of the district.

Patients were admitted to the district hospitals on the basis of medical need. After admission, they were assigned to medical teams made up of faculty members, residents, interns, and students, on the basis of the patient's particular medical problem. The district provided medical care for indigent citizens of Dallas County and a limited number of paying patients. The intern and residency program was established by the district to provide "education for graduate medical students, and [to] avail itself of the services of these physicians for the care of the indigent sick."

While he was an intern in 1968, Dr. Weinberg spent time on the medical service, the psychiatric service, the pediatric service, and the obstetrical and gynecological service. During this time, he examined patients, participated in evaluations and in taking histories, proposed diagnoses, assisted in giving treatment, and participated in making rounds and in deciding which drugs or medications to prescribe. He did not perform or assist in surgery during this time. Dr. Weinberg had no primary or direct responsibility for the care or treatment of patients. He was under close and immediate supervision at all times and could not prescribe or administer any treatment on his own initiative. His

performance was supervised and evaluated by the faculty of the university.

As an intern, Dr. Weinberg attended lectures and conferences daily. He also attended seminars which were coordinated into the internship training program.

On July 1, 1968, Dr. Weinberg started a 4-year surgical residency program with the university. During this program, he spent time on general surgery service, neurosurgery service, thoracic surgery service, and other surgical subspecialties.

During his first year of residency, Dr. Weinberg examined patients, participated in evaluations and in taking patient histories, proposed diagnoses, assisted in giving treatment, made rounds, prescribed drugs and medications, and assisted in the performance of surgery. He participated in approximately 500 operations in his first year. He did not have any primary or direct responsibility for the care or treatment of patients. He did not perform any services independently or without direct supervision.

As a second-year resident, Dr. Weinberg was given more responsibility and was under less direct control. He continued to receive supervision, but it was less direct. As he continued in his residency, he was given more independence and received less supervision. He regularly attended 10 to 15 lectures, conferences, and seminars a week. He participated in approximately 600 operations during the first 6 months of his second year.

During his internship and residency, Dr. Weinberg was on duty for 36 hours, off for 12, on for 12, off for 12, and then the cycle was repeated. He was on duty as much as 120 hours per week. When on duty, Dr. Weinberg was required to remain at the hospital during meal periods so that he would be available for emergency calls. Emergencies did occur requiring him to participate with others in providing medical treatment to patients during meal periods. While on duty at Parkland, Dr. Weinberg purchased all his meals at the hospital cafeteria or from coin-operated food machines. He spent approximately $100 per month on food in the cafeteria at Parkland.

On March 24, 1967, Dr. Weinberg entered into a contract with Parkland for his internship from July 1, 1967, through June 30, 1968. He agreed to conform to all hospital rules and discharge all the duties of a house staff officer. He was to be paid $260 per month plus "An additional cash allowance of $100.00 per month

* * * to cover costs of food and housing whether purchased from the hospital or purchased outside." Dr. Weinberg was prohibited from any form of private practice without permission. On November 27, 1967, and February 5, 1969, he signed similar contracts for his residency program. During the first year of his residency, the basic monthly payment was to be $290, and during the second year, it was to be $455. In addition, he was to continue to receive the cash allowance of $100 per month for food and housing.

In 1968, Dr. Weinberg was paid the following amounts by the hospitals:

| | |
|---|---|
| Parkland | $3,299.79 |
| Presbyterian | 656.25 |
| Veterans | 247.66 |
| Total | 4,203.70 |

In 1969, he was paid $3,991.38 by Parkland and $1,429.62 by Veterans. In each year, he was paid only by the hospital where he was working at the time. He was also paid $1,000 each year by Parkland as a cash allowance for food and housing while he was working at Parkland. Dr. Weinberg was paid regularly with income and F.I.C.A. taxes withheld. He accrued 2-weeks vacation per year and received free hospitalization coverage, medical care, and free educational materials. He also received free laundry service for his white coats while he was a resident.

Parkland had more than 300 interns, residents, and fellows on its medical house staff in 1968. While the staff physicians might have been able to carry on the work of the hospital without the assistance of the interns and residents, to have done so would have required the staff physicians to work harder and longer hours, and the quality of the medical care would have been diminished.

On his 1968 and 1969 income tax returns, Dr. Weinberg excluded $3,600 and $1,800, respectively, of the basic payments which he received in connection with his internship and residency. Mrs. Weinberg excluded $1,800 on her 1969 income tax return. Neither Dr. Weinberg nor Mrs. Weinberg included on their returns for 1968 and 1969 any part of the allowance for meals and lodging. The Commissioner has determined that none of these payments were excludable from income.

OPINION

Here, we have another claim that the payments received by an intern and resident are excludable under section 117 as a scholarship or fellowship grant. In this case, the claim is based on the contentions that such payments were a scholarship or fellowship grant because of the degree of supervision and control over the activities of the intern and resident and because his services were not "necessary" to carry on the work of the hospital.

A scholarship or fellowship grant is excludable from income under section 117(a). However, in the case of a taxpayer who is not a candidate for a degree, section 117(b)(2)(B) limits the exclusion "to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year." Such exclusion is not allowable for more than 36 months. Although "scholarship" and "fellowship grant" are not defined in the statute, section 1.117-3(c) of the Income Tax Regulations provides: "A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." In addition, section 1.117-4(c)(1) of such regulations states that if any "amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor," it does not qualify for exclusion under section 117. In *Bingler v. Johnson*, 394 U.S. 741, 751 (1969), the Supreme Court upheld the validity of such regulations and stated that the definitions contained therein comport with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients."

The test to be applied under the regulations is whether the primary purpose for making the payments to the taxpayer was to educate and train him or to compensate him for services rendered. See *Robert W. Carroll*, 60 T.C. 96 (1973); *Aloysius J. Proskey*, 51 T.C. 918 (1969); *Elmer L. Reese, Jr.*, 45 T.C. 407 (1966), affd. per curiam 373 F. 2d 742 (4th Cir. 1967). In a host of cases, interns and residents have sought to exclude the payments received by them in connection with their internships or residencies, but the almost unanimous conclusion of the courts

has been that the intern or resident was furnishing valuable services to the hospital and that the payments received by him were compensatory. See *Birnbaum v. Commissioner,* 474 F. 2d 1339 (3d Cir. 1973), affg. without published opinion a Memorandum Opinion of this Court; *Parr v. United States,* 469 F. 2d 1156 (5th Cir. 1972); *Hembree v. United States,* 464 F. 2d 1262 (4th Cir. 1972); *Rundell v. Commissioner,* 455 F. 2d 639 (5th Cir. 1972), affg. per curiam a Memorandum Opinion of this Court; *Quast v. United States,* 428 F. 2d 750 (8th Cir. 1970); *Woddail v. Commissioner,* 321 F. 2d 721 (10th Cir. 1963), affg. a Memorandum Opinion of this Court; *Sheldon A. E. Rosenthal,* 63 T.C. 454 (1975); *Geral W. Dietz,* 62 T.C. 578 (1974); *Jacob T. Moll,* 57 T.C. 579 (1972); *Frederick Fisher,* 56 T.C. 1201 (1971); *Irwin S. Anderson ,* 54 T.C. 1547 (1970); *Aloysius J. Proskey, supra; Tobin v. United States,* 323 F. Supp. 239 (S.D. Tex. 1971); *Kwass v. United States,* 319 F. Supp. 186 (E.D. Mich. 1970); *Wertzberger v. United States,* 315 F. Supp. 34 (W.D. Mo. 1970), affd. per curiam 441 F. 2d 1166 (8th Cir. 1971); but see *Leathers v. United States,* 471 F. 2d 856 (8th Cir. 1972), cert. denied 412 U.S. 932 (1973). The facts of this case present no reason for reaching a different conclusion, and we hold that the payments made to Dr. Weinberg were for the services rendered by him to the hospitals and were not an excludable scholarship or fellowship grant.

Dr. Weinberg worked primarily at Parkland during the years in issue, but on occasion, he was rotated to Presbyterian or Veterans. He received payments only from the particular hospital where he was working at such time. Furthermore, he was under formal contract with Parkland to perform services as directed, and he could not engage in private practice without permission. A disinterested "no-strings attached" motive by the various hospitals cannot be inferred from these arrangements. See *Geral W. Dietz, supra; Jacob T. Moll, supra; Frederick Fisher, supra; Irwin S. Anderson, supra.*

The payments to Dr. Weinberg had none of the normal characteristics of a fellowship. See *Irwin S. Anderson,* 54 T.C. at 1550; *Elmer L. Reese, Jr.,* 45 T.C. at 413. There is no evidence that he received the payments because of financial need or because of exceptional merit displayed in his prior academic work. See *George L. Bailey,* 60 T.C. 447, 454 (1973); *Robert Henry Steiman,* 56 T.C. 1350, 1355 (1971); *Aloysius J. Proskey,*

51 T.C. at 924; *Edward A. Jamieson*, 51 T.C. 635, 639 (1969). On the contrary, the payments to Dr. Weinberg had many of the characteristics of compensation. They were increased as he gained experience, and income and F.I.C.A. taxes were withheld on such payments. Compare *Aloysius J. Proskey, supra,* and *Elmer L. Reese, Jr., supra,* with *Chander P. Bhalla,* 35 T.C. 13 (1960). He also received hospitalization insurance, free medical care, and 2-weeks paid vacation. These fringe benefits are characteristic of an employer-employee relationship. See *Irwin S. Anderson, supra; Aloysius J. Proskey, supra.*

Dr. Weinberg testified that the services of interns and residents were not necessary for the operation of the hospitals because their services could have been performed by the attending staff physicians. Though he may have been correct in saying that the services of the interns and residents were not "necessary," we are not convinced that the hospitals could have operated as well without their services. As we stated in *Frederick Fisher,* 56 T.C. at 1215:

More fundamentally, even if the Center *could* do without residents, it did not do without them; it used their services, and it paid for them. Many employees may be dispensable in the sense that their employers could "operate" without them. But such dispensability hardly renders their salaries noncompensatory. [Emphasis in original.]

Dr. Weinberg and the other interns and residents worked long hours at the hospitals and performed extensive services in assisting in the care of patients. If we look at only one patient and the care provided him, it is conceivable that the staff physicians could have performed the services without the assistance of the interns or residents. However, to judge the value of the services furnished by the interns and residents, we cannot consider just one case, but we must consider all the patients cared for by the hospitals. It seems clear that if the staff physicians had been required to provide all of the medical care for all the patients of the hospitals, they would have been required to work many more hours, and one wonders whether the hospitals would have been able to care for as many patients. Furthermore, in providing medical treatment, the examination of the patient by several trained doctors and their views may often be of value, even though one of the doctors may have more experience than the others. Thus, although the services of the interns and residents

may not have been "necessary," we are not convinced that they lacked value to the hospitals.

Nor is the supervision and control exercised over Dr. Weinberg's services uncharacteristic of compensation. Probably every employee who receives compensation is subject to some supervision and control. For example, the services of the nurses and technicians who assisted in the care of the patients were subject to supervision and control, but the payments for such services are nonetheless compensation. See *Tobin v. United States,* 323 F. Supp. at 241. In fact, close supervision of Dr. Weinberg's work may have increased its benefits to the hospitals. See *Frederick Fisher,* 56 T.C. at 1212; *Jerry S. Turem,* 54 T.C. 1494, 1505 (1970).

We also hold that Dr. Weinberg may not exclude any of the allowance for meals and lodging. Section 119 provides that the value of meals furnished on the business premises of the employer for his convenience is excludable from the employee's gross income. Section 1.119-1(c)(2) of the Income Tax Regulations provides:

(2) The exclusion provided by section 119 applies only to meals and lodging furnished in kind by an employer to his employee. * * * Cash allowances for meals or lodging received by an employee are includible in gross income to the extent that such allowances constitute compensation.

In *Burl J. Ghastin,* 60 T.C. 264 (1973), a recent Court-reviewed opinion, we examined the legislative history of section 119 and reaffirmed our previous position that meals must be furnished "in kind" to qualify for the exclusion. See *Michael A. Tougher, Jr.,* 51 T.C. 737 (1969), affd. per curiam 441 F. 2d 1148 (9th Cir. 1971), cert. denied 404 U.S. 856 (1971); *Charles N. Anderson,* 42 T.C. 410 (1964), revd. on other grounds 371 F. 2d 59 (6th Cir. 1966), cert. denied 387 U.S. 906 (1967).

Dr. Weinberg does not challenge such rule, but does argue that the cash allowance was equivalent to furnishing meals in kind since he was required to remain at the hospital at mealtime and used the allowance to purchase meals at the Parkland cafeteria. However, the cash allowance was given to him to use as he saw fit. There was no requirement that he use it for meals eaten at the hospital; he could have brought his meals from home. Moreover, there is no evidence indicating that the allowance was reduced when he was away on vacation or because of sickness; apparently, he received the allowance irrespective of whether he

was actually on duty during the week. In addition, Dr. Weinberg's employment contract characterized the allowance as "An additional cash allowance." For these reasons, it is clear that the allowance was merely additional compensation.[3]

The Fifth Circuit Court of Appeals, to which this case would be appealable, has rejected our position that meals must always be furnished "in kind" to be excludable under section 119. *United States v. Barrett,* 321 F. 2d 911 (5th Cir. 1963); compare *United States v. Keeton,* 383 F. 2d 429 (10th Cir. 1967); *United States v. Morelan,* 356 F. 2d 199 (8th Cir. 1966); *Saunders v. Commissioner,* 215 F. 2d 768 (3d Cir. 1954), revg. 21 T.C. 630 (1954); with *Wilson v. United States,* 412 F. 2d 694 (1st Cir. 1969); *Burl J. Ghastin, supra.* However, Dr. Weinberg would not prevail even under the view of the Fifth Circuit. In *Magness v. Commissioner,* 247 F. 2d 740 (5th Cir. 1957), affg. 26 T.C. 981 (1956), cert. denied 355 U.S. 931 (1958), the Fifth Circuit held that a subsistence payment made to a Georgia highway patrolman was not excludable from gross income under section 39.22(a)-3 of Regs. 118, which then set forth the convenience of the employer rule now contained in section 119. The court held that since the subsistence payments were not restricted to reimbursements for specific expenses, but could be used for any purpose with no accounting, the payments were income and were not paid for the convenience of the employer. This view was not overruled by *United States v. Barrett, supra,* which allowed the highway patrolmen to exclude reimbursement for specific expenses incurred. In that case, the patrolmen were required to submit expense vouchers substantiating their expenses. In *Barrett,* the Fifth Circuit specifically held that its decision in *Magness* was distinguishable because the patrolmen in *Barrett* were limited to reimbursement for proven expenses. It is clear that the payments made to Dr. Weinberg were like the payments in *Magness* and not those in *Barrett,* and that under the view of the Fifth Circuit, such payments constitute additional compensation.

*Decision will be entered for the respondent.*

---

[3] See *Walter L. Peterson,* T.C. Memo. 1974-293.