WILLIAM S. KAMMERER and SONIA L. KAMMERER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kammerer v. Commissioner
Docket No. 7341-72.
United States Tax Court
T.C. Memo 1976-11; 1976 Tax Ct. Memo LEXIS 391; 35 T.C.M. (CCH) 30; T.C.M. (RIA) 760011; January 19, 1976, Filed *391 Held, no part of a stipend received by petitioner as resident at Medical Center Hospital of Vermont qualified as an amount received as a fellowship, excludable under sec. 117, I.R.C. 1954. Held,further, petitioner is not entitled to deduct the cost of his meals purchased at the hospital while on emergency duty. William S. Kammerer, pro se. Gerald V. May, Jr., for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency of $330.14 in petitioners' income tax for the taxable year 1969. Two questions are presented for our consideration: (1) Did the stipend received by petitioner William S. Kammerer during the year 1969 constitute a fellowship within the meaning of section 117, I.R.C. 1954, [1] and thereby entitle petitioners to exclude $3,600 of said stipend from gross income; and (2) were petitioners entitled to a deduction of $84 for the cost of meals eaten by William S. Kammerer when required to eat in close proximity to the hospital, at which he was a resident, in order to be available for emergencies. FINDINGS OF FACT Some *392 of the facts have been stipulated and the stipulation together with associated exhibits are incorporated herein by this reference. William S. and Sonia L. Kammerer resided in Buenos Aires, Argentina, at the time the petition herein was filed. During the year at issue petitioners resided in Huntington, Vt. Sonia L. Kammerer is a party in these proceedings solely by virtue of having filed a joint return with her husband for the year 1969 with the district director of internal revenue, Burlington, Vt. William S. Kammerer will hereafter be referred to as petitioner. During the taxable year 1969, petitioner, a medical doctor, was enrolled in his second year of the internal medicine residency program of the Medical Center Hospital of Vermont -- University of Vermont. In his capacity as a second-year resident he received a stipend of $6,900. On his 1969 tax return petitioner excluded from gross income $3,600 of the $6,900 stipend on the ground that the stipend received constituted a fellowship within the meaning of section 117. [2] *394 Respondent, in a notice of deficiency dated April 25, 1972, determined that no portion of the stipend received by petitioner was excludable as a scholarship or fellowship *393 grant and accordingly increased gross income by $3,600. [3] The Medical Center Hospital of Vermont, Inc. (hospital), is a charitable corporation as described in section 501(c)(3) organized under the laws of the State of Vermont. The corporation, which resulted from a merger of two hospitals, the Mary Fletcher Hospital and De Goesbriand Memorial Hospital, Inc., was created for the stated purposes of operating a general public hospital for the medical and surgical treatment of the sick and injured, conducting and operating laboratories, teaching medical technicians *395 and technologists, conducting research, and affiliating itself as a teaching hospital and school of nursing. The hospital constituted the major community hospital for the 80,000 residents of the greater Burlington area. The hospital had a bed capacity of 775 and each year admitted more than 20,000 patients, treated nearly 40,000 patients in emergency rooms, and had over 25,000 outpatient visits. The primary purpose for the existence of the hospital was to provide medical and surgical care to the sick and injured. As part of the merger described above, the Medical Center Hospital of Vermont, Inc., adopted an "Agreement of Affiliation with the University of Vermont and State Agricultural College" in which the parties associated themselves for the purpose of rendering service, promoting and improving medicine and general health, patient care, teaching and research. Thus, the hospital acted as the teaching arm of the University of Vermont College of Medicine (University). During the year 1969, the hospital had approximately 200 physicians on the attending staff all of whom, in pursuance of the affiliation of the hospital with the University, held faculty appointments at the University. *396 During the tax year at issue, the University and the hospital conducted internship and residency programs in a number of medical specialty fields including that of internal medicine. A brochure which is sent to all prospective interns and residents contained general descriptions of the various programs offered by the University and the hospital, including the internal medicine program which was described by the chairman of the department of medicine. The second-year level internal medicine residency program, in which the petitioner was enrolled during 1969, was depicted as consisting of 8 months' training in elective specialty rotations and 4 months of general inpatient experience. Specifically, petitioner's activities during the year in question consisted of 4 months' work on the general medicine rotation, 2 months of laboratory work in a virus research program, 2 months of research in the field of endocrinology, all of which were performed at the Medical Center Hospital of Vermont, and 2 months on a special rotation program at the Schweitzer Hospital in Haiti which emphasized the study and treatment of various tropical diseases. [4] *397 When serving on the general medicine rotation, petitioner was assigned to the staff of one of the hospital's major medical units. Each unit consisted of 19 to 30 patient beds and the staff for each unit included the private physicians who admitted patients, the unit attending physician, a resident and an intern, and third-and fourth-year clinical clerks. Petitioner's responsibilities as a resident during this period included: (a) Direct and continuing supervision of interns and senior students in his unit; (b) writing brief but incisive notes on each patient admitted to his unit and admitting patients when an intern was not available; (c) making certain professional exchange was complete and effective--coordinating communications about patients among Private Attending and Unit Attending, interns, students, nurses and Social Service personnel; (d) outlining and directing major unit teaching functions such as work rounds, attending rounds, Social Service and nursing rounds; (e) assigning cases for student workup and providing careful supervision and instruction in all instances; and *398 (f) dictating or writing succinct discharge summaries on all service cases within 24 hours of discharge, and calling referring physicians personally before or at the time of the discharge of all patients. Petitioner's daily schedule Monday through Friday during this general medicine rotation was prescribed by the hospital and consisted of: 7:30 - 9:30 a.m.
House staff rounds - this
included seeing all patients
in the petitioner's unit and
conducting discussions with
the patients' private physicians
and the unit nursing staff.
9:30 - 10:30 a.m.
Residents' Report to attend-
ing physicians.
10:30 - 12:00 p.m.
Teaching attending rounds,
or reading time.
12:30 - 1:30 p.m.
Medical specialty conferences--
these usually consisted of
informal luncheon discussions
with unit attending physicians.
2:00 - 6:00 p.m.
Admissions, procedures, consulta-
tions -- this period included
seeing patients with particularly
interesting ailments, attending
special hospital meetings, doing
reference work in the library,
seeing newly admitted patients,
reviewing the day's activities,
and planning activities for the
following day. Petitioner's duties during this general medicine rotation also included being on call, serving as second-call *399 resident, at the hospital every third night and every third weekend to cover emergencies. Either he or a unit intern was required to see all new patients assigned to his unit within 30 minutes after admission and to call the admitting physicians within 2 hours of each scheduled admission for discussion and directions in reference to patient management. During petitioner's general medicine rotation he saw an average of 17 patients a day including those hospitalized in his unit, the new admissions, and out-patient visits. During the aforementioned rotations in a virus research program and endocrinology at the hospital, petitioner conducted classes in infectious disease and endocrinology for the medical faculty, saw requested consultations, made rounds at the hospital with the attending staff, and served as a second-call resident for emergencies every third evening. During the 2-month rotation period at the Schweitzer Hospital in Haiti, petitioner was engaged in the study of tropical medicine and saw requested consultations in the wards of that hospital. The petitioner, as a second-year resident in the internal medicine residency program, was not a candidate for a degree but was pursuing *400 a training program which leads to certification as a specialist in internal medicine by the American Board of Internal Medicine. Appointments to the residency program were made on a yearly basis and petitioner initiated his recruitment to the program. Petitioner's stipend was paid 80 percent by the hospital, 20 percent by the University. The stipend amount was not determined by reference to petitioner's financial needs; all second-year internal medicine residents received the same amount of stipend. The University issued a T.D. Form W-2 and withheld Federal income tax and F.I.C.A. During the taxable year at issue, petitioner received the following fringe benefits: (a) 25 percent of his medical insurance premiums (paid by the University of Vermont); (b) coverage by workmen's compensation; (c) eligibility for TIAA group life insurance; (d) free drugs for resident and family (provided by drug companies); (e) 1 month paid vacation; (f) free laundering of white coats; and (g) regular University benefits as available to full-time University faculty and staff. Said partially paid medical insurance, eligibility for group life insurance, and free drugs for resident and family were not available *401 to graduate assistants or graduate fellows at the University of Vermont. The respondent, in the notice of deficiency, disallowed a meals deduction claimed by petitioner of $84. This expense was incurred when petitioner was on night call and was required to eat in close proximity to the hospital in order to be available for emergencies. Respondent disallowed this deduction on the basis that the petitioner was not away from his principal place of employment overnight on business travel, and, therefore, the expense incurred was a personal expense. The petitioner, during the taxable year in issue, was employed in the same community in which he resided. Meals for residents were not provided by the hospital or University without cost, and when on night call, petitioner had a choice of either paying for his evening meal or providing for his meal in another manner. ULTIMATE FINDING OF FACT The payments received by petitioner from the hospital and the University were compensation for services rendered. OPINION The first question for our consideration is whether petitioner was entitled to exclude $3,600 of the stipend he received from the Medical Center Hospital of Vermont--University of Vermont, *402 on the basis that it was a fellow-ship within the meaning of section 117. This issue has been pre sented in a multitude of cases which have come before this Court in which the determinative question has been whether the stipend received represented a fellowship grant or compensation for services. Section 117 provides generally for the exclusion of amounts received as fellowships, with certain limitations, but does not contain the definition of a "fellowship." The respondent filled this gap by promulgating section 1.117-3(c), Income Tax Regs., which provides that "A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." However, section 1.117-4(c) makes it clear that if the amount paid to aid said individual in the pursuit of study or research "represents either compensation for past, present, or future employment services or represents payment for services which are subject to direction and supervision of the grantor" then the amount is not a fellowship. The Supreme Court in Bingler v. Johnson,394 U.S. 741, 751 (1969), specifically found that this latter regulation comported with the meaning *403 of the statute and upheld its validity. The Court found that this regulation reflected "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no strings' educational grants, with no requirement of any substantial quidproquo from the recipients." To determine whether a stipend received represents a fellowship grant under section 117 or merely gross income from wages includable under section 61, we must determine why the stipend was paid. Robert W. Carroll,60 T.C. 96 (1973); Elmer L. Reese, Jr.,45 T.C. 407 (1966), affd. per curiam 373 F. 2d 742 (4th Cir. 1967); Chandler P. Bhalla,35 T.C. 13 (1960), see also Hembree v. United States,464 F. 2d 1262 (4th Cir. 1972). And the purpose of the payments is in large part determined by the nature of the activities of the recipient. Thomas P. Phillips,57 T.C. 420 (1971); Irwin S. Anderson,54 T.C. 1547 (1970); Stephen L. Zolnay,49 T.C. 389 (1968). Petitioner contends that the sole purpose of the residency program in internal medicine at the hospital was educational; to train physicians as specialists in that field of medicine. He further contends that he did not perform substantial services for the *404 hospital and that any services he did perform were merely incidental to his education and of little, if any, benefit to the hospital. It follows, he alleges, that the stipend granted by the hospital and University was solely for the purpose of allowing him to pursue his education. [5] Unquestionably, one of the primary purposes for the establishment of the residency program by the hospital was to train specialists in internal medicine. However, this was not the principal purpose for the stipend payments received by petitioner. The residency program *405 was integrated with the other programs of the hospital in order that the hospital might pursue its various goals and accomplish its stated purposes, pre-eminent of which was the treatment of patients. From the record as a whole, we find that the payments received by petitioner were made in return for the services he rendered to the hospital. Contrary to petitioner's allegations, he did render substantial services. He had, as previously described, [6] numerous specifically defined responsibilities for the care of hospital patients. His daily schedule for the 4 months during which he was engaged in the general medicine rotation included: Making rounds seeing all patients assigned to his unit; making written and oral reports on patients' conditions, etc., to the hospital attending physicians as well as the patients' private physicians; writing notes on each patient admitted to his unit and supervising the admission of such patient; and every third night and every third weekend serving as internal medicine resident on emergency call. During the remainder of the year, except for a 1-month paid vacation, petitioner taught classes, saw requested consultations, served on emergency call, and *406 made rounds with the attending staff of the hospital at which he was assigned. These activities were the basis for the $6,900 petitioner received in 1969. Petitioner cites the fact that all decisions made by him concerning patient diagnosis and care were countersigned and/or directed by a physician of the hospital attending staff or the patient's private physician, and that legal responsibility for the treatment of the patient rested elsewhere, for the proposition that his services were not only incidental to his education but were of no value to the hospital. Petitioner misconceives the significance of the close supervision of his activities. As we stated recently in response to this same argument: in providing medical treatment, the examination of the patient by several trained doctors and their views may often be of value, even though one of the doctors may have more experience than the others. [Steven Michal Weinberg,64 T.C. 771 (1975) at p. 778.] Indeed the supervision illustrates the importance of his work and may have increased its benefits to the hospital. [7] Whether or not the hospital could have operated without the services of the residents has been held *407 by this Court to be irrelevant. In Frederick Fisher, 56 T.C. 1201 (1971) at p. 1215 we said: even if the [hospital] could do without residents, it did not do without them; it used their services, and it paid for them. Many employees may be dispensable * * * [but] such dispensability hardly renders their salaries noncompensatory. Furthermore, the supervision of petitioner's activities together with the determination of what activities he was to perform, the establishment of his daily routine and the prescription of procedures he was to follow in order to meet his specified responsibilities and perform his duties, all lead to the inescapable conclusion that he was acting as an employee of the hospital and was paid therefor, see Steven Michael Weinberg,supra;FrederickFisher,supra;Irwin S. Anderson,supra;Ethel M. Bonn,34 T.C. 64 (1960(; cf. George L. Bailey,60 T.C. 447 (1973), and bring this case clearly within the respondent's regulations. Sec. 1.117-4(c). Several other factors add to the basis of our conclusion that an employer-employee relationship existed between *408 the hospital and petitioner pursuant to which petitioner received compensation for services. The stipend rates established by the hospital were uniform for internal medicine residents and were not determined on the basis of financial needs of the individual residents as is common in the case of fellowship grants. FrederickFisher,supra;Irwin S. Anderson,supra;Aloysius J.Proskey,51 T.C. 918 (1969); Edward A. Jamieson,51 T.C. 635 (1969); cf. George L. Bailey,supra; and Aileene Evans,34 T.C. 720 (1960). And petitioner received various fringe benefits together with a 1-month paid vacation. [8] *409 Woddail v. Commissioner,321 F. 2d 721 (10th Cir. 1963); Steven Michael Weinberg,supra;Irwin S. Anderson,supra;Aloysius J. Proskey,supra; Edward A. Jamieson,supra; cf. George L. Bailey,supra.
The facts in this case are strikingly similar to those in Aloysius J. Proskey,supra, and Irwin S. Anderson,supra, to say nothing of numerous other cases decided by this Court in recent years in which we have held that stipends received by interns and residents in working and teaching hospitals did not qualify for exclusion under section 117. There are some slight variations in the facts of this case and the facts in Proskey and Anderson, but none which would so distinguish those cases that they would not be controlling of our decision here. See StevenMichael Weinberg,supra. On the other hand, this case is distinguishable from Frederick A. Bieberdorf,60 T.C. 114 (1973), *410 and George L. Bailey,supra, in which we found the stipends received by petitioners were excludable because in those cases the recipients devoted most of their time to study and research and very little of it to patient care. We do not doubt that petitioner sought and accepted the appointment to the hospital's internal medicine residency program for educational purposes; nor do we doubt, from a review of the evidence of his activities during the year in question, that petitioner was justifiably satisfied with the educational content of his experiences. Nonetheless, the determinative factor in this proceeding is that petitioner performed services for the hospital and was compensated therefor. He was paid to work rather than to study. Stephen L. Zolnay,supra.This is the "quid pro quo" that the Supreme Court in Bingler v. Johnson,supra, spoke of and the type of situation the regulations specifically preclude from the definition of fellowship grants. Therefore, petitioner must include the entire $6,900 in gross income. Finally, we consider the question of the deductibility of the costs incurred by petitioner for meals consumed when on emergency call at the hospital. Petiioner mistakenly *411 relies on section 119 as the basis for his deduction. Section 119 provides an exclusion from gross income for the value of meals furnished by, on the premises of, and for the convenience of, the employer. Because petitioner seeks to exclude (deduct) only the cost of meals taken at the hospital while on emergency call, he could satisfy the latter two requirements. However, we need not consider the possibility of an exclusion because no meals in kind were furnished nor was any portion of the stipend allocated to the cost of such meals and petitioner testified that he received no stipend for meals. Steven Michael Weinberg,supra.
The proper section upon which we must focus to determine whether or not the cost of petitioner's meals was deductible is section 162(a). This issue has previously been considered by this Court on a number of occasions in the context of meals purchased by State highway troopers while on duty, [9] and also in a case involving a resident physician in which the facts were almost identical to those now at hand. [10] In all of those cases we have found that the costs of meals are nondeductible personal expenses. Exceptions to this general rule are limited to circumstances *412 where: The expenses are incurred for business purposes; [11] the costs of the meals are afforded special treatment under other Code sections; [12] *413 or the costs are expended while on business away from home, overnight, under section 162(a)(2). [13] See sec. 1.262-1(b)(5), Income Tax Regs. No business purpose has been shown to have existed, indeed, the expenses sought to be deducted herein were those incurred solely for petitioner's own meals; [14] nor are any other Code sections relevant to this issue. And during the taxable year in question petitioner resided in Huntington, Vt., in the same general community as, although about 30 miles from, his place of employment. Clearly, petitioner was not "away from home" within the meaning of section 162(a)(2) while at the hospital. Ronald D. Kroll,49 T.C. 557 (1968). [15] Therefore, we must also decide this issue for respondent.
Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. Included with petitioner's tax return were two T.D. Form W-2's,"Wage and Tax Statements;" one represented the $6,900 stipend at issue herein, the other listed the Grant Foundation of Pittsburg, Pa., as employer and indicated $757.15 as wages paid. Attached to petitioner's return was a "Schedule of Income" in which petitioner computed the amount of his wages, entered on line 11 of Form 1040, as follows: Gross Income from University
of Vermont (Form W-2)
$6,900.00
less: Fellowship Exclusion
( $300 per month x 12 months)
-3,600.00
3,300.00
Albert Schweitzer Hospital,
May - June 1969
715.15
Fee from State of Vermont for
services - 1969
165.00
"Net taxable wages" - line 11, pg. 1
4,180.15
Apparently the wages paid by the Grant Foundation were those included by petitioner as related to his activities at the "Albert Schweitzer Hospital;" thus, a mathematical error or $42.20 was made. However, the parties, at trial and on brief, stated that the 2-month period during which petitioner was at the Albert Schweitzer Hospital constituted a portion of his residency program. At no time did the parties refer to a separate stipend or amount of remuneration received which related to petitioner's presence at the Schweitzer hospital. We were led to believe that the $6,900 was the total amount of money petitioner received for his participation in the entire residency program for 1969. Because of the absence of facts on this question, and because our decision herein is unaffected by this situation, we shall proceed to discuss this case premised on the parties' representations. 3. Petitioner claimed certain itemized deductions on his tax return for 1969 including medical and dental expenses; respondent's notice of deficiency included a downward adjustment of the medical and dental deductions allowed, due to the determined increased gross income.↩
4. For 1 month during the year 1969 petitioner was on vacation and during the other month of the year 1969 the petitioner's activities are unaccounted for.
5. The affiliation agreement entered into by the hospital and University established contractual privity between these entities and consequently both may be properly deemed "the grantor" of petitioner's stipend. While the University issued petitioner's T.D. W-2 and acted as withholding agent for Federal taxes and F.I.C.A. payments, the hospital established petitioner's duties and responsibilities and prescribed the procedures for carrying them out and also paid 80 percent of the stipend amount. For purposes of convenience the hospital shall be referred to herein as the grantor of the concerned stipend. See Frederick Fisher,56 T.C. 1201↩ (1971).
6. See p. 7, supra.↩
7. See Steven Michael Weinberg,64 T.C. 771 (1975); Frederick Fisher,supra;Jerry S. Turem,54 T.C. 1494↩ (1970).
8. Petitioner argued that there was no "guaranteed vacation" for residents; that vacations were allowed at the discretion of the department chief. Whether or not a vacation was "guaranteed" seems to us to be of little, if any, relevance; the fact is a vacation was allowed petitioner. However, petitioner's contention is based on the following language contained in the brochure describing the hospital's residency programs (see p. 6, supra): "Residents are eligible for three weeks of vacation each year. Scheduling of vacations is at the discretion of the department or division chairman." We interpret this language to mean that a resident is entitled to a vacation, but, the scheduling of the time↩ the vacation may be taken must be authorized by the department chairman. This is a common condition in most employment arrangements which allows the employer to ensure that sufficient employees will be on hand at all times so as not to disrupt his normal business.
9. Robert J. Kowalski, 65 T.C. - (Oct. 14, 1975); Charles H. Hyslope,21 T.C. 131 (1953); Robert H. Saunders,21 T.C. 630 (1954), revd. on other grounds 215 F. 2d 768 (1954). See also Louis Drill,8 T.C. 902↩ (1947). 10. See Bayard L. Moffit,T.C. Memo. 1972-187↩. 11. Id., sec. 1.262-1(b)(5), Income Tax Regs.↩
12. Sec. 212; sec. 217(b)(1)(D). 13. Robert J. Kowalski,supra.↩
14. Cf. La Forge v. Commissioner,434 F. 2d 370 (1970), at fn. 2, affg. in part and revg. in part 53 T.C. 41↩ (1969). 15. See Bayard L. Moffit,supra.↩