DOUGLAS Y. TATE AND CORINNE J. TATE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tate v. Commissioner
Docket No. 12045-81.
United States Tax Court
T.C. Memo 1984-206; 1984 Tax Ct. Memo LEXIS 464; 47 T.C.M. (CCH) 1611; T.C.M. (RIA) 84206; April 24, 1984. Christine R. Mayer, for the petitioners. Dale L. Newland, *465 for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency in petitioners' Federal income taxes for tax year ended December 31, 1977, in the amount of $2,015. After concessions, the sole issue for decision is whether petitioners may exclude from their gross income, pursuant to section 117, [1] certain payments received by petitioner while he was a candidate for a doctoral degree, and serving as a teaching assistant at the University of Minnesota. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Douglas Y. Tate (hereinafter referred to as "petitioner") and his wife, Corinne J. Tate, (hereinafter referred to, collectively, as "petitioners") were residents of Edina, Minnesota at the time of filing the petition herein. Corinne J. Tate *466 is a party to this proceeding solely by reason of filing a joint Federal income tax return with petitioner for their tax year ended December 31, 1977. Petitioners filed such Federal income tax return with the Internal Revenue Service Center in Ogden, Utah. At all times here pertinent, the University of Minnesota (hereinafter referred to as the "University") was an educational organization within the meaning of section 170(b)(1)(A)(ii), and operated on an academic calendar commencing on July 1 of each year, and ending on June 30 of the following year. In 1970, petitioner enrolled in a combined program at the University leading to both an M.D. degree from the School of Medicine, and a Ph. D. degree in anatomy from the Department of Anatomy within the School of Medicine. On June 12, 1976, petitioner received his M.D. degree from the University. The requirements for the Ph. D. degree in anatomy included successful completion of various courses and examinations, preparation and defense of a thesis, and reading knowledge of a foreign language. In addition, all candidates for the Ph. D. degree in anatomy were required to engage in teaching at the University. For the period *467 between July 1, 1976 and June 30, 1977, while he was a candidate solely for a Ph. D. degree in the anatomy department, petitioner was appointed by the University to a forty-seven percent of full-time teaching assistant position. Such appointment was reflected on formal University personnel forms used for salaried employees. Petitioner's teaching assistant appointment provided for payment of a stipend during the period from July 1, 1976 until June 30, 1977 in the amount of $5,295.96, computed as forty-seven percent of the annual full-time salary base for that position, which was in the amount of $11,268. For undisclosed reasons, however, petitioner actually received a stipend during this period in the amount of $5,546, paid in biweekly installments, from each of which Federal income taxes were withheld. The position of teaching assistant was one of several funded graduate assistant appointments for which a student was eligible upon admission to the University's graduate school. Other such appointments included research assistants, and administrative fellows. The establishment of such appointments resulted from the University's decision in 1948 to link the financial support *468 of graduate students to the University's needs for undergraduate instructors. Prior to that year, growing instructional needs had been substantially met with full-time instructional staff. Later, such appointments were expanded to encompass the instruction of graduate students. During the period here in issue, it was the dual purpose of the graduate assistant appointments, as stated in the official University Handbook for Graduate Assistants for the fall of 1976, first, to meet instructional and research needs of the University, and second, to provide the recipient student with the opportunity for individual development through both instructional and research activities, and the financial aid provided therefor. Appointments to such graduate assistant positions were made solely on the basis of academic merit, and without regard to individual financial need. [2]
*469 The role of teaching assistants, as distinguished from teaching associates, was described in the University's foregoing Handbook for Graduate Assistants, in pertinent part, as follows: A teaching assistant or associate provides assistance in the actual teaching of students in a specified course of courses, under the general supervision of the academic staff. Each department classifies its own teaching assignments according to the level of responsibility required. Duties of teaching assistants may include grading of examinations and reports, supervision and instruction of laboratory classes, recitation sections and intern groups, and preparation of examination or class materials, under direct supervision of a member of the academic staff. Teaching associates perform these duties and, in addition, (may) have primary responsibility for course organization, administration, or grading. Acceptance of an offer of a graduate assistantship by a student was considered by the University to complete an employment agreement, which both the student and the student's college were expected to honor, and from which the student wishing to change his plans was expected to obtain a formal release. *470 As a graduate assistant with a teaching assistant appointment, petitioner received several benefits, described by the University as "fringe benefits." First, petitioner paid lower in-state tuition rates, and this privilege extended to members of his immediate family, and could, under specified circumstances, be extended beyond the term of the qualifying appointment. Second, petitioner was eligible for workmen's compensation benefits. Third, petitioner was covered by travel accident insurance while traveling on University business. Fourth, petitioner was eligible to join and to receive nine-month loans from the University's credit union. In addition, petitioner was entitled to certain formal procedures governing grievances and dismissals. Graduate assistants received no formal sick or vacation leave. Graduate assistants with in excess of fifty percent appointments, which did not include petitioner, were eligible for certain group life and health insurance benefits. A schedule of annual full-time salary bases applicable to the various graduate assistant appointments was developed each year by the University on the basis of studies of comparable rates paid in similar institutions. *471 For the 1976-1977 academic year, such rates applied, in ascending order of magnitude, to research assistant, teaching assistant and administrative fellow I, teaching associate I and administrative fellow II, and teaching associate II appointments. The same annual full-time salary base applied to all teaching assistants throughout the University, with individual variations resulting solely from, first, whether the position was for the academic year or for a full twelve-month period, and second, whether the position was for full-time or a percentage of full-time. Funds for graduate assistant appointments or the teaching assistant type, including petitioner's appointment, were derived from the same fund from which academic staff salaries were derived, the general operation and maintenance fund of the University. Approximately two-thirds of that money was appropriated to the University by the Minnesota legislature, and approximately one-third was derived from other sources, such as tuition. When the legislature appropriated state funds to the University it also set the percentage increase for the base salaries for academic staff. The president of the University then authorized the *472 disbursement of the money to each college in a budget letter, stating the budget for each college and the foregoing annual full-time salary bases for graduate assistants. The actual allocation of funds to each college, at least at times, contained a designation of funds as being for the purpose of teaching assistantships, in which case such funds represented the amount of money dedicated for such purpose in the prior year plus the legislated percertage increase for the current year. At the beginning of each budget year, the School of Medicine, at least to some extent, could move its state-appropriated funds from graduate assistant stipends into civil service salaries and vice versa. [3]
Pursuant to his appointment, during the period from July 1, 1976 to February 18, 1977, petitioner taught four medical students in two medical histology laboratory courses, in subjects relating to the microscopic identification of *473 human tissue. Such teaching work required petitioner to spend between six to nine hours per week in the laboratory. In addition, petitioner was responsible for setting up and grading examinations. In all such teaching activities, petitioner was closely supervised by a faculty advisor. During the same period that he served as a teaching assistant, petitioner was also involved in activities related to the research requirements of his degree program. Petitioner worked in the anatomy laboratory on his chosen basic research project in the area of the detection of antibodies on platelets, under the direction of his faculty advisor, Dr. Robert L. Sorenson. Petitioner authored several publications relating to his research in which he credited Dr. Sorenson as a coauthor. During the 1976-1977 academic year, there were four candidates for Ph. D. degrees in anatomy who received neither teaching assistant appointments nor other financial support from the University. Of those four students, one was a foreign national who received financial aid from his native country and one received a pre-doctoral fellowship from the National Science Foundation. The remaining two students failed to receive *474 University funding because of their insufficient academic merit, but these two students were funded through teaching assistant appointments after their first year in the anatomy program. Like other candidates for the Ph. D. degree in anatomy, these four students were required to meet the University's requirements for their degrees, including teaching requirements. Between July 1, 1977 and June 30, 1978, petitioner was classified by the University as a medical fellow specialist in the Department of Pediatrics at the University, and was engaged from August 1977 through November 1977 in a pediatric internship, which was not part of a degree program. This change in petitioner's status was reflected on an official University personnel form, and carried with it an increased annual full-time salary base in the amount of $11,925. In or about June 1982, petitioner received his Ph. D. degree from the anatomy department at the University. Determining that the payments received by petitioner from the University during 1977, in the amount of $8,736, did not qualify as an excludable scholarship or fellowship under section 117, respondent on March 10, 1981, determined the foregoing deficiency *475 against petitioners. Petitioners concede that the stipend paid to petitioner by the Department of Pediatrics during the period July 1, 1977 until December 31, 1977, in the amount of $5,963, is not an excludable scholarship or fellowship pursuant to section 117. This concession leaves to be determined herein the teaching assistant stipend received by petitioner during the period January 1, 1977 throught June 30, 1977, in the amount of $2,773. [4]
*476 OPINION The sole issue for our decision is whether payments received by petitioner as a teaching assistant are excludable from his gross income under section 117(a). Section 117(a) excludes from the gross income of an individual any amount received as a scholarship or fellowship grant. In the case of an individual who is a candidate for a degree, this general exclusion is limited by section 117(b)(1). [5] However, such limitation, and the exception contained therein, is only applicable if the payment in question first has been found to constitute a scholarship or fellowship grant. Reese v. Commissioner,45 T.C. 407, 413 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). *477 The terms "scholarship" and "fellowship grant" are not defined in the statute. Section 1.117-3(c), Income Tax Regs., defines "fellowship grant" as an amount "paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." The regulations define "scholarship" in a similar manner. Section 1.117-3(a), Income Tax Regs.
The test to be applied is whether the primary purpose underlying the payment was to educate the recipient or whether it was to compensate him for services rendered. Yarlott v. Commissioner,78 T.C. 585, 595 (1982), affd. 717 F.2d 439 (8th Cir. 1983); Weinberg v. Commissioner,64 T.C. 771, 776 (1975). Thus, if an amount paid "represents either compensation for past, present, or future employment services," then such amount is not to be considered as an amount received as a scholarship or a fellowship grant for purposes of section 117. Section 1.117-4(c), Income Tax Regs. The validity of section 1.117-4(c), Income Tax Regs., was upheld in Bingler v. Johnson,394 U.S. 741, 751 (1969), wherein the Supreme Court declared: [T]he definitions supplied by the Regulation *478 clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial quidproquo from the recipients. Our inquiry is accordingly reduced to whether the stipend paid to petitioner was intended primarily to be in return for his services, or whether it was intended to furnish him with an opportunity to further his education for his own benefit. Petitioners bear the burden of proof in this respect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). On this record, which is replete with indicia of a compensatory arrangement, petitioners have failed to meet that burden. As we have found, prior to the advent of teaching assistantships at the University, growing instructional needs at the undergraduate level had been met with additional paid faculty. Later, teaching assistants helped to meet the instructional needs of graduate students as well, and during the period here in issue, it was the first-stated purpose of the various teaching and research graduate assistantships to meet the instructional *479 and research needs of the University. As we have also found, all candidates for the Ph. D. degree in anatomy were required to fulfill certain teaching requirements at the University. Petitioner's appointment as a teaching assistant during the period July 1, 1976 to June 30, 1977 apparently fulfilled such teaching requirements of his degree program, but significantly, also served the historical purpose of such appointments -- provision of instructional staff needed to meet the educational missions of the various schools within the University. A student's acceptance of a teaching assistantship was considered by the University to complete an employment agreement, requiring the recipient to meet whichever of the manifold and substantial teaching-oriented responsibilities described in the official Handbook for Graduate Assistants, might be required by his particular school. Petitioner's appointment (and his later change to medical fellow specialist status) was reflected on formal University personnel forms used for salaried employees. [6]
Petitioner devoted some six to nine hours per week to teaching four *480 medical students in two medical histology laboratory courses during the period from July 1, 1976 to February 18, 1977, and was additionally responsible for setting up and grading examinations. While petitioners make much of the fact that these activities were conducted under the supervision of a faculty advisor, it is clear that this fact alone does not negate the existence of a substantial quidproquo.[7]
For his teaching and examination-related services, petitioner received a stipend, paid out over the period July 1, 1976 to June 30, 1977, in the amount of $5,546. The magnitude of this stipend, when measured against the time devoted by petitioner to such services, is highly suggestive of compensation for services rendered. [8] Furthermore, consistent with such a compensatory arrangement, graduate assistants, like petitioner, were provided with several "fringe benefits," including lower instate tuition rates, eligibility for workmen's compensation benefits, [9] travel accident insurance, and special credit union privileges. In addition, graduate assistants were entitled to certain formal procedures *481 governing grievances and dismissals, which were described in detail in the official Handbook. Also consistent with such a compensatory purpose is both the source of the funds for petitioner's teaching assistant appointment for 1977 and the form of disbursal of such funds. Stipends for teaching assistants were derived from the same state funds used to pay academic staff salaries. Whenever the allocation of funds within the University to each college designated funding for teaching assistantships, such designated funds consisted of the amount of money dedicated for such purpose in the prior year plus the legislated percentage increase foracademicsalaries for the current year. In addition, at the beginning of each budget year, the medical school was authorized to move funds, to some undisclosed extent, between teaching assistant and civil service positions. In the absence of evidence that such civil service positions did not include at least some instructional staff, we can only conclude that funds could thus be moved from instructional *482 staff salaries to teaching assistant stipends, again suggesting the commonness of purpose underlying such funding. Finally, during the tax year in issue, petitioner received his stipend, not in a lump-sum, but in biweekly installments, from which the University withheld Federal income taxes.
Petitioners maintain that teaching assistants, like petitioner, were often considered to be more of a burden than a benefit to their faculty advisors. Neither petitioner nor his faculty advisor, Dr. Robert L. Sorenson, testified that petitioner's services were more of a burden than a benefit, however, and any such conclusion would, in any event, seem to be inconsistent with what we have seen to be the historical purpose of teaching assistantships -- the provision of instructional staff needed to meet the educational missions of the University. Petitioners also maintain that the teaching activities assigned to petitioner were considered by the anatomy department to constitute a learning experience for him.We note that petitioners have failed to show that this "learning experience" rose to the level of entitlement to academic credit at the University. In any event, that the anatomy department *483 may have considered petitioner's teaching activities to constitute a learning experience for him, would not negate the predominance of another purpose for such funding -- that is, provision of the University with needed instructional staff. See Proskey v. Commissioner,51 T.C. 918, 925 (1969). The activities which petitioner performed under his teaching assistantship, according to petitioners, were no different than activities required of other candidates for the Ph. D. degree in anatomy who did not have teaching assistant appointments, including the two unfunded candidates who were enrolled in the program during the 1976-1977 academic year. We have found that some level of teaching activity was required of all candidates for the Ph. D. degree in anatomy. We have also found that while petitioner met this requirement through his appointment to a teaching assistantship during the 1976-1977 academic year, four other candidates for the Ph. D. degree in anatomy did not serve as teaching assistants during that academic year, of whom one was a foreign national funded by his native country, one was funded by a pre-doctoral fellowship, and two, by reason of deficiencies in *484 their academic merit, were unfunded. Petitioners have failed to establish on this record, however, that any of these four students either actually taught during the 1976-1977 academic year, or were otherwise unfunded by teaching assistantships atthetime that they did teach. Indeed, as we have found, the two unfunded students did received funded teaching assistantships immediately after their first year in the program, and it may well have been at that point that their teaching activities commenced. Finally, petitioners rely herein upon Steiman v. Commissioner,56 T.C. 1350 (1971), wherein this Court held excludable under section 117, financial aid received by the taxpayers while they were graduate students studying for doctoral degrees. The award of graduate assistant positions in Steiman, however, was predicated upon the individual financial need of academically qualified students. In the instant case, on the other hand, each graduate assistant within the teaching assistant category was paid at his appropriate percentage of the annual full-time salary base, and appointment to that category was based solely upon academic performance, and not *485 upon financial need. Furthermore, while the evidence in Steiman demonstrated that the taxpayers were paid to study rather than to work, the instant record amply shows the converse of that proposition.[10]
We accordingly hold that petitioner provided substantial teaching services in return for his payments from the University, and that such payments were intended primarily to compensate him for such services. Such payments are therefore includable in petitioners' gross income for 1977. To reflect the foregoing, Decision will be for the respondent.
Footnotes
1. All statutory references herein are to sections of the Internal Revenue Code of 1954, as amended and in effect for the year in issue, and all references to Rules are to the Tax Court Rules of Practice and Procedure, unless otherwise stated.↩
2. Dr, David W. Hamilton, a professor and chairman of the anatomy department at the University, testified that the amounts paid to teaching assistants could vary from student to student based upon need and that such variations had indeed occurred. This testimony is not corroborated on this record and appears to be inconsistent with the stipulation of the parties herein that teaching assistants throughout the University received the same annual rate of payment. Moreover, in the context of the highly structured graduate assistant program disclosed herein, we do not find credible Dr. Hamilton's testimony that "during the year students will have various needs of one sort or another and they will come to me and ask whether money can be made available so that they can have more credits, * * * take more courses * * *, or they may have financial needs beyond." In light of the foregoing considerations, and on the strength of consistent testimony herein that recipients of graduate assistant positions were not called upon to disclose their financial needs, we have found that such positions were awarded without regard to individual financial need.↩
3. As stated by Dr. N. L. Gault, dean of the medical school, "But at the beginning of the budget year, the department head may choose to do away with a civil service position, a secretary or a clerical, and can move that into teaching assistant stipends * * *."↩
4. Our determination that the total amount received by petitioner in 1977, or $8,736, consisted of $5,963 from the conceded Pediatrics stipend, and $2,773 from the teaching assistant stipend in issue, rests upon our finding that petitioner received a teaching assistant stipend for the period from July 1, 1976 to June 30, 1977 in the amount of $5,546, paid to him in biweekly installments. We believe on this record that such installments were paid to petitioner ratably over such period, meaning that between January 1, 1977 and June 30, 1977, he received one-half of the total stipend, or $2,773. Deducting this 1977 teaching assistant stipend from the total amount received by petitioner in 1977, in the amount of $8,736, yields the amount of the Pediatric stipend during the second half of 1977, or $5,963. This determination is consistent with petitioners' estimate, reflected in the stipulation of the parties (this estimate has apparently been accepted by respondent), and is also consistent with the characterization of the stipends reflected on petitioners' Federal income tax return for 1977.↩
5. Sec. 117(b)(1) provides as follows: SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS (b) Limitations.-- (1) Individuals Who Are Candidates For Degrees.--In the case of an individual who is a candidate for a degree at an educational organization described in section 170(b)(1)(A)(ii), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph.↩
6. Compare Pozar v. Commissioner,T.C. Memo. 1980-559↩.
7. See McKenna v. Commissioner,T.C. Memo. 1979-370↩.
8. See McKenna v. Commissioner,supra.↩
9. Compare Langley v. Commissioner,T.C. Memo. 1982-460↩.
10. Closer to the facts of the present case is a Memorandum Opinion of this Court, McKenna v. Commissioner,supra, finding compensatory a stipend received by the taxpayer, a candidate for a Ph. D. degree in chemistry, while serving as a teaching assistant, where teaching was a requirement of the degree program, and where such stipend was awarded without regard to the financial need of the recipient. See also Zimmerman v. Commissioner,T.C. Memo. 1984-207↩, decided on this same date.