RICHARD BOGDAN AND MARIANNE BOGDAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bogdan v. Commissioner
Docket No. 11250-76.
United States Tax Court
T.C. Memo 1978-261; 1978 Tax Ct. Memo LEXIS 253; 37 T.C.M. (CCH) 1127; T.C.M. (RIA) 78261; July 17, 1978, Filed John T. Nimmons, for the petitioners. Peter D. Bakutes, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $ 704 in petitioners' Federal income tax for the year 1973. The issue for decision is whether amounts paid in 1973 to petitioner Richard Bogdan as a resident in podiatry by the California College of Podiatric Medicine is excludable from his gross income under the provisions of section 117, Internal Revenue Code. [1] Originally the petitioner excluded $ 3,600 of the $ 5,983.34 paid to him in 1973, and the deficiency resulted from the disallowance of that amount. However, the petitioner alleged in his petition that the entire $ 5,983.34 is excludable from his gross income, and therefore he claims an overpayment of $ 375 for that year. *255 FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. Richard and Marianne Bogdan were legal residents of Pleasant Hill, California, when they filed their petition in this case. Richard Bogdan (petitioner) was graduated from Monmouth College, Monmouth, New Jersey, with a B.S./A.A. degree in June 1965. From June 1965 to 1968 he participated in a leukemia project at Rutgers University. From 1968 to 1970 he attended the Philadelphia School of Podiatric Medicine. From July 1970 to May 1972 he attended the California College of Podiatric Medicine (CCPM) and was awarded the degree of Doctor of Podiatric Medicine by CCPM on May 27, 1972. In 1972, petitioner was licensed as a podiatrist by the State of California. In 1973 he was also licensed in Oregon and Florida. CCPM was founded in 1914. It is located in San Francisco. Subsequently, in 1960, it organized the California Podiatry Hospital (the Hospital) and podiatric outpatient clinics (the Clinics). The Hospital and the Clinics are part of CCPM and are not separate legal entities. CCPM has a single president, a single board of trustees, a single payroll office, a single personnel office, *256 a single accounting office, a single security force, a single purchasing department, and a single library. All expenses of CCPM, including expenses of the Hospital and expenses of the Clinics, are paid from a single "general fund" without segregation as to their origin. All revenues received by CCPM are paid into the "general fund" without segregation as to their origin as student (undergraduate) tuition, Clinics or Hospital patient fees, or other categories of receipts. Podiatric medicine is that speciality of medicine and surgery which is concerned with the prevention, diagnosis and treatment of diseases and disorders which affect the human foot and contiguous structures. Podiatrists diagnose various medical conditions (such as diabetes, heart and kidney diseases) which first manifest themselves in the foot and refer patients presenting such problems to other health professionals. CCPM provides inpatient podiatric hospital care and outpatient podiatric clinic care to members of the San Francisco community. Its patients are primarily Medicaid, Medical, Medicare and private insurance patients. CCPM, through the Clinics and the Hospital, provides podiatric care to any *257 individual having a podiatric problem or a podiatry-related medical problem, including examination and diagnosis, surgery, therapy, rehabilitation, prescribing of medications, and postoperative follow-up of surgical patients. The objectives and purposes of CCPM, as set forth in its Constitution and By-Laws, are as follows: Section 1. To operate, support and maintain the California College of Podiatric Medicine. Section 2. To operate, support and maintain the California Podiatry Hospital with its Outpatient Department. Section 3. To promote the art and science of Podiatric Medicine. Section 4. To improve the health, and especially the foot health, of the general public. Section 5. To instruct students in all aspects of podiatric medical practice and to graduate those who complete the College curriculum in accordance with standards established by its Board of Trustees. Section 6. To encourage and conduct research in the science of Podiatric Medicine and related sciences. Section 7. To encourage and foster literature relating to podiatric medicine. Section 8. To confer such degrees as are permitted by law. Section 9. To engage in such other activities *258 deemed appropriate by the Board of Trustees and consistent with the foregoing. One of the reasons for establishing the Hospital was to provide a specialized inpatient facility at which podiatrists could provide services to patients. The Hospital is a modern, 28-bed facility in which an average of 7 to 10 podiatric surgeries are performed each day. The Clinics evaluate and treat more than 20,000 podiatric outpatients per year. At all times material to this case, the Clinics and the Hospital were approved by the California Medical Association and were licensed by the California Department of Health. In 1973, CCPM was one of five institutions in the United States which offered educational programs leading to professional degrees in podiatric medicine. It awarded the degrees of Bachelor of Science, Doctor of Podiatric Medicine, and Masters in Podiatric Surgery. CCPM was accredited by the Western Association of Colleges and its podiatric residency program was certified and approved by the American Podiatry Association. In California, a licensed podiatrist may perform podiatric surgery, diagnose and treat podiatric diseases and conditions, prescribe medications, administer *259 local anesthesia for podiatric surgeries, and admit patients to podiatric or other hospitals at which he has staff privileges. In California, an individual must be awarded a Doctor of Podiatric Medicine degree by an approved college of podiatry and successfully complete certain national board examinations in order to be licensed as a podiatrist. All CCPM podiatric residents were (or during their first year of podiatric residency were required to become) licensed California podiatrists. In January 1972, petitioner applied to CCPM for appointment as a podiatric resident. He served as a podiatric resident at CCPM from July 1972 to June 30, 1974. The objectives of the CCPM podiatric residency program included, among other things, (1) to provide high-quality comprehensive podiatric services to the patients served by CCPM; (2) to develop means for utilizing podiatric manpower more efficiently; and (3) to provide an intensive period of multidisciplinary graduate training for podiatric physicians, preparing individuals qualified to accept broad responsibilities as clinicians and teachers in podiatric medicine and surgery. In 1973, CCPM had six first-year podiatric residents and *260 four second-year podiatric residents. Petitioner's first year of CCPM podiatric residency included 8 or 9 months of rotation to institutions other than CCPM. While on rotation to institutions other than CCPM, petitioner took patient histories, gave physicals, made preliminary diagnoses of medical and podiatric conditions, and prepared "work-ups" on patients he examined. As a result of his first-year rotations as a podiatric resident to institutions other than CCPM, petitioner gained experience and training in podiatry. The remaining 3 or 4 months of his first year of CCPM podiatric residency consisted of three rotations within the Hospital and the Clinics, i.e., the Anesthesia rotation, the Podiatric Surgery (inpatient or Hospital) rotation, and the Podiatric Medicine (outpatient or Clinics) rotation. While on the Podiatric Medicine (outpatient or Clinics) rotation at CCPM during his first year of podiatric residency, petitioner, subject to close supervision of staff members, evaluated outpatients, made preliminary diagnoses, presented his evaluations and diagnoses to staff podiatrists, performed simple podiatric procedures such as trimming corns and applying pads, and followed *261 surgery patients postoperatively. Some of these procedures were duplicated by staff members. While on the Anesthesia rotation at CCPM during his first year of podiatric residency, petitioner, subject to the close supervision of staff members, evaluated patients, took patient histories, recorded patient histories, maintained the anesthesia airway in the operating room during surgery, and followed patients postoperatively. While on the Podiatric Surgery (inpatient or Hospital) rotation at CCPM during his first year of podiatric residency, petitioner subject to the supervision of staff members, worked up patients, presented his findings to staff podiatrists, evaluated new inpatients medically and with regard to lower-extremity conditions, recorded his work-ups, saw approximately 10 cases per week, scrubbed for surgery, was part of the surgical team, performed surgery, attended rounds, was listed on the operative report, evaluated patients postoperatively, proposed treatment programs and changes in treatment programs, and wrote orders for medications. In 1973, first-year CCPM podiatric surgery residents performed approximately 30 surgeries per resident per year. While on rotation *262 at CCPM, all first-year CCPM podiatric residents, including petitioner, were on call at CCPM every third or fourth night. The on-call schedule for first-year CCPM podiatric residents was arranged so that one of the first-year residents was on call every night, including weekends and holidays. CCPM first-year podiatric residents who were on call were required to remain within the CCPM premises from 5 p.m. to 8 a.m. the following morning on their on-call nights. While on call at CCPM as a first-year podiatric resident, petitioner screened patient problems and complaints, observed Hospital inpatients, contacted the staff or private podiatrist if necessary regarding his findings, carried out the staff or private podiatrist's instructions, and performed routine duties, such as loosening bandages and authorizing some medications without contacting the podiatrist. Petitioner spent the entire 12 months of his second year of podiatric residency at CCPM serving in the Clinics and in the Hospital. As a second-year podiatric resident at CCPM, petitioner was subject to less supervision and was given greater responsibility for patient care and teaching first-year podiatric residents and *263 undergraduate students than as a first-year podiatric resident. CCPM second-year podiatric residents, including petitioner, had on-call responsibilities at CCPM. When on call at CCPM, second-year podiatric residents were required to carry a pager (beeper) on their person and to remain within 50 miles and one hour's travel time of CCPM from 5 p.m. to 8 a.m. the following morning on their on-call nights. If a CCPM podiatric resident is unable to fulfill his assigned on-call responsibilities at CCPM, he is required to obtain coverage of his on-call responsibilities by another podiatric resident. In 1973, second-year podiatric residents at CCPM performed approximately 120 to 200 surgeries per resident per year. In 1973, podiatric residents at CCPM, including the petitioner: a. attended formal lectures; b. participated in rounds; c. instructed other medical and podiatric personnel; D. administered emergency treatments; e. maintained a patient load in the Clinics; f. determined procedures; g. managed patients in the Hospital; h. followed patients postoperatively; i. examined Clinics outpatients; j. examined Hospital inpatients; k. made preliminary *264 diagnoses; l. participated in clinical conferences; m. made specialized examinations in vascular diseases, neurological diseases and orthopedic diseases; n. evaluated the ability of patients to undergo general or local anesthesia; o. administered local anesthesia; p. examined, diagnosed and treated lower-extremity pathologies; q. diagnosed and treated soft tissue and osseous neoplasms; r. observed, diagnosed and managed post-surgical complications; s. diagnosed and treated dermatoses; t. diagnosed and treated sprains, fractures, strains, contusions and hematomas; u. fabricated orthotic devices; v. utilized consultant services; w. took histories; x. performed physicals; y. recorded histories and physicals; z. made entries on patient charts; aa. wrote treatment orders (including ordering medications, recommending surgery, recommending physical therapy, and recommending rehabilitation); ab. scrubbed for surgery; ac. assisted in surgery; ad. reviewed laboratory test results. Petitioner was Chief Resident at CCPM for 2 months of his second year of podiatric residency. As Chief Resident, petitioner was called upon to assist with *265 the more involved surgical cases. CCPM podiatric residents participate in a Journal Club in which each podiatric resident surveys a given podiatric or medical journal and presents articles from that journal to other podiatric residents and to staff podiatrists for discussion. In 1973, patient care at the Hospital and in the Clinics was dispensed by patient-care teams, which consisted of a staff or faculty podiatrist, a first-year podiatric resident and/or a second-year podiatric resident, and an undergraduate student. In the event of an acute emergency, the CCPM podiatric resident would remain with his patient-care team and assist in treating the patient. Absent a specific direction from the attending staff podiatrist that no podiatric resident be involved in the treatment of a particular CCPM patient, all Hospital patients and Clinics patients were subject to examination, study and treatment by CCPM podiatric residents. CCPM podiatric residents are involved in providing patent-care services to approximately 90 to 95 percent of all CCPM patients. If his patient-care responsibilities as a podiatric resident conflicted with his attendance at lectures or seminars, petitioner *266 was required to give priority to his patient-care responsibilities. CCPM podiatric residents were permitted to observe CCPM's school holiday only if all residency responsibilities were adequately covered. At all times material to this case, CCPM annually prepared a "Residency Protocol" which was distributed to all CCPM podiatric residents and which was furnished to the A.P.A. as part of the A.P.A.'s periodic reevaluation of the CCPM podiatric residency program. The 1970/1971 CCPM Residency Protocol, which was similar in all material respects to the 1973 CCPM Residency Protocols, provided, in part, that: a. the first-year CCPM podiatric resident will perform his duties under the direction of the Director of Post-Graduate Education; b. the first-year podiatric resident will be responsible for the diagnosis, care and treatment of CCPM patients; c. the first-year podiatric resident will direct and train undergraduate students in the performance of duties assigned to the students; d. if other duties cause him to be late or absent, the first-year podiatric resident will notify the Chief of the service to which the resident is assigned in sufficient time to permit adequate *267 coverage; e. the first-year podiatric resident will be available for duty as House Doctor for overnight and weekend coverage; f. Hospital and Clinics assignments take precedence over attendance at seminars, and absence from such assignments shall be by excuse by the Director of the particular service only; g. the first-year podiatric resident, under the direction of the Surgical Department, is responsible for the history and the physical, surgical selection, and surgical and post-surgical management of all minor clinical surgeries, including come-and-go cases, superfical tumors, subcutaneous tenotomies, ungual matricectomies performed by chemical or electical techniques, and any other procedures which in the discretion of the Surgical Department he is assigned to supervise and perform; h. the first-year podiatric resident will participate in inpatient surgeries; i. the first-year podiatric resident will participate in grand rounds, case presentations, and clinical conferences; j. the first-year podiatric residency includes one month of Hospital floor duty; k. the second-year podiatric resident performs as an integral part of the Department of Surgery; l. the *268 residency program will make available to the Department of Surgery and to the Department of Diagnosis at least one second-year podiatric resident during all periods of operation of each department; m. the second-year podiatric resident assumes responsibility for the care of patients on inpatient and outpatient services; n. the second-year podiatric resident maintains charting for each patient assigned to him until the patient is transferred to another department, another resident, or to another member of the faculty other than the resident's Chief; o. the second-year podiatric resident maintains diagnostic and treatment summaries on all cases assigned to him; p. the second-year podiatric resident prepares and has authorized by his department faculty all hospital admit form orders, insurance forms, operative reports, hospital summaries, and all other documents pertinent to the case; q. the second-year podiatric resident verifies the costs of fees for services for the patients in his care; r. the House Resident supervises other podiatric residents; s. the House Resident ensures high standards of inpatient care; t. the House Resident supervises and participates *269 in house staff duty rotation in the Hospital; u. the House Resident is responsible for seeing that all charting and laboratory tests are completed promptly; v. podiatric residents shall observe the proprieties of conduct and courtesies that are consistent withe their profession and in accordance with the rules and regulations governing the operations of CCPM and its Hospital and Clinics; and w. the above-stated rules and regulations apply to each podiatric resident. The Council on Podiatry Education of the A.P.A. publishes "Criteria and Guidelines for Podiatric Residency Programs," which states the criteria and guidelines followed by the A.P.A. for approving and certifying podiatric residency programs, including the CCPM podiatric residency program. The A.P.A. "Criteria and Guidelines for Podiatric Residency Programs" states, inter alia, that: a. the major part of the podiatric residency program should be in the hospital setting; b. the physical facilities in which the podiatric residency program is conducted should include inpatient and outpatient facilities for patient care; c. the podiatric resident should gain experience in maintaining medical records, making *270 entries on medical records, completing medical histories, and performing physical examinations; d. the podiatric resident should receive supervised clinical experience in the recognition and management of pedal and related conditions; e. the institution should have an ambulatory care facility where the podiatric resident may treat patients; f. the podiatric resident should follow patients postoperatively, practice basic podiatric procedures, and fabricate orthotic devices; g. the podiatric resident should have teaching responsibilities; h. the podiatric resident should be worthy as to clinical competence; i. the resident should be given a formal contract or a letter of appointment which outlines the duties of the resident, the term of the contract, the hours of "work," the stipend, the fringe benefits, such as meals, uniforms, vacation policy, sick leave policy, health insurance, hospital insurance, liability insurance, payment of dues for membership in professional organizations, and any housing provisions; Petitioner entered into a written contract with CCPM with respect to his podiatric residency. The 2-year podiatric residency program in which petitioner participated *271 at CCPM was divided into 32 semester hours of prescribed activities, consisting of 3 hours of thesis planning and thesis writing, 1 hour of "Fundamentals or Principles of Education," and the remaining 28 hours devoted to clinical conferences, teaching other personnel, and Hospital and Clinics assignments. As a CCPM podiatric resident, petitioner spent 7 to 10 percent of his time listening to podiatric and medical lectures, 15 to 20 percent of his time in instructing other personnel, and 50 percent of his time in patient-care activities. CCPM podiatric residents spend 60 to 70 hours per week in their residency program. As a podiatric resident at CCPM, petitioner wore a white, medical-type jacket. In front of Hospital and Clinics patients, petitioner was addressed as "Dr. Bogdan." As a CCPM podiatric resident, petitioner received or was eligible to receive: a. $ 300 per month as a first-year resident; b. $ 500 or $ 550 per month as a second-year resident; c. meals when on call; d. medical and hospitalization insurance; e. malpractice and liability insurance; f. sick leave of 2 weeks per year; and g. vacation of 2 weeks per year, as approved. The amounts *272 paid by CCPM to first-year and second-year CCPM podiatric residents in 1973 were uniform in amount. In 1973, CCPM paid second-year CCPM podiatric residents more than it paid first-year CCPM podiatric residents. Patients of the Clinics and the Hospital were not separately billed for services provided to them by staff nurses, maintenance personnel, or podiatric residents. The CCPM podiatric residency is a signgle, 2-year residency program. CCPM podiatric residents are not obligated to apply for or accept employment with CCPM at the conclusion of their residencies. As an acute care medical facility, CCPM was required to have a licensed medical doctor on the CCPM premises at all times, whether or not a licensed podiatrist was present on the premises at the same time. As a licensed Doctor of Podiatric Medicine in 1973, petitioner could have practiced as a private podiatrist in California in 1973 and could have earned about $ 35,000 per year in such practice. As of January 19, 1978, petitioner had not yet defended his thesis at CCPM and had not yet been awarded his Masters degree by CCPM. On his 1973 Federal income tax return, the petitioner claimed deductions for travel *273 and for a seminar on arthritis, both of which deductions were claimed in conjunction with his CCPM podiatric residency. OPINION This case is another in a long line of medical "stipend" cases tried in this Court since the Supreme Court's decision in Bingler v. Johnson, 394 U.S. 741 (1969). Like other cases of this ilk, this one is also not crystal clear. The evidence lends some support to petitioner's position. Most of his work was supervised. Some of it was duplicated. To be sure, he received valuable training as a CCPM resident. But the factors which we have frequently found to be fatal to a section 117 exclusion are once again present here. Petitioner devoted long and regular hours to his residency program. He provided valuable, varied and extensive services to CCPM and the Residency Protocol leaves no doubt that he was expected to provide such services to CCPM. His financial arrangements with CCPM were indicative of an employer-employee relationship, and he was treated as a fellow health care professional by other members of the CCPM staff. Section 117(a) provides that any amount received as a scholarship at an educational institution or as a fellowship *274 grant, including the value of contributed services and accommodations, is not to be included in gross income. The favorable tax treatment granted under subsection (a) is limited under subsection (b), however, and a distinction is drawn between whether the recipient is or is not a candidate for a degree at an educational institution. Under subsection (b)(1), in the case of an individual who is a qualifying degree candidate, subsection (a) does not apply to the portion of any amount received which represents payment for "services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant." However, services required of all candidates for a particular degree are not to be regarded as the prohibited "part-time employment." Under subsection (b)(2), in the case of a non-degree candidate, the application of subsection (a) is limited to scholarships and fellowships proceeding from certain enumerated types of grantors, and further "to an amount equal to $ 300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year" for not more than a total of 36 months. *275 Of overriding importance is section 1.117-4(c), Income Tax Regs., which provides, in pertinent part, that with the exception noted above for certain degree candidates, "any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor" is not to be considered a scholarship or fellowship grant for purposes of section 117. The validity of this regulation was upheld by the Supreme Court in Bingler v. Johnson, supra at 751, where it observed that the meaning of "fellowships" comports with their ordinary understanding as "relatively disinterested, 'no strings' educational grants, with no requirement of any substantial quidproquo from the recipients." On this record we find and conclude that the amounts here in dispute were paid to petitioner as the quid pro quo for his professional podiatric services and, consequently, they are not excludable (in whole or in part) as a scholarship or fellowship grant. In short, the *276 petitioner was paid to work, not to study. See and compare Fisher v. Commissioner, 56 T.C. 1201 (1971); Moll v. Commissioner, 57 T.C. 579 (1972); Proskey v. Commissioner, 51 T.C. 918 (1969); Anderson v. Commissioner, 54 T.C. 1547 (1970); Weinberg v. Commissioner, 64 T.C. 771 (1975); Brubakken v. Commissioner, 67 T.C. 249 (1976). Petitioner contends that he falls within the ambit of Rev. Rul. 75-280, 1975-2 C.B. 47. That ruling provides that where (1) the taxpayer is a candidate for a degree at an educational institution, (2) the taxpayer performs part-time services for the institution which satisfy then existing specifically stated requirements for the degree, and (3) equivalent services are required of all candidates for the degree, the Internal Revenue Service will generally assume that all amounts paid to the taxpayer by the institution on account of such services are for the primary purpose of furthering the education and training of the taxpayer in his individual capacity (with the result that such amounts are excludable from gross income as a scholarship or fellowship *277 grant under sections 1.117-3 and 1.117-1(a), Income Tax Regs.). Rev. Rul. 75-280 inspremised upon section 117(b) (1)[2] of the Code. It is our view that section 117(b) (1) and Rev. Rul. 75-280 are not applicable in this case for two reasons. The first reason is that petitioner's residency at CCPM was full-time rather than part-time work. CCPM *278 had only 10 podiatric residents in 1973, of which 6 were first-year residents. The 6 first-year residents spent 8 or 9 months on rotations outside CCPM, leaving an average of 2 first-year residents and 4 second-year residents in the Hospital and the Clinics at any given time. CCPM records 20,000 outpatient visits annually, has a 28-bed inpatient facility and averages from 7 to 10 podiatric surgeries per day. The 6 CCPM podiatric residents on rotation within the Hospital and the Clinics were involved in providing patient care services to approximately 90 to 95 percent of all CCPM patients. Each second-year CCPM podiatric resident performed 120 to 200 surgeries per year. The activities assigned to them were varied, extensive and obviously time-consuming. The podiatric residents worked nights, weekends and holidays, and averaged 60 to 70 hours per week in their residency programs. Only 7 to 10 percent of the residents' time was spent in listening to lectures. About 70 percent of their time was spent in patient-care activities and in instructing other personnel. Petitioner's residency program was divided into 32 semester hours of activities; only 4 of these 32 semester hours *279 were devoted to activities other than clinical conferences, instructing other personnel and patientcare assignments. The second reason for rejecting petitioner's contention is that CCPM is not an "educational institution" within the meaning of section 117(b)(1). The term "educational institution," as used in section 117(b)(1), is defined in section 151(e)(4) as one which maintains a regular faculty and an established curriculum and has a regularly organized body of students in attendance at the place where its educational activities are conducted. Sections 1.117-3(b) and 1.151-3(c), Income Tax Regs. The term does not include on-the-job training. CCPM operates both an undergraduate Doctor of Podiatric Medicine program (from which petitioner was graduated in 1972) and a Masters in Podiatric Science program (the podiatric residency program involved in this case). The undergraduate program had a student body of 300 to 400 and a formal bulletin in which such subjects as student affairs, the undergraduate curriculum, academic departments and academic courses are extensively discussed. CCPM also has a regularly constituted faculty for the Doctor of Podiatric Medicine program, including *280 a significant number of full-time faculty members. By contrast, the CCPM podiatric residency program has a total of only 10 participants. The podiatric residency program consists almost entirely of clinical rounds, patient-care activities and instruction of fellow CCPM personnel by the residents, with only a small percentage of time devoted to didactic lectures. CCPM has no formal curriculum for the podiatric residents other than on-the-job patientcare training. And the podiatric residency "faculty" consists solely of practicing podiatrists who have staff privileges at the Hospital and in the Clinics. In short, the CCPM podiatric residency program is simply an intensive, 70 hour per week on-the-job training program, which in our opinion is indistinguishable in its operation from a standard medical residency program. Accordingly, we conclude that CCPM is not an "educational institution" vis-a-vis the podiatric residency program in which the petitioner participated. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated.↩
2. Section 117(b) (1) provided in 1973: (b) Limitations.-- (1) Individuals who are candidates for degrees.--In the case of an individual who is a candidate for a degree at an educational institution (as defined in section 151(e) (4)), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research, or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph.↩