HENRY E. NINO and ELIZABETH L. NINO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nino v. Commissioner
Docket No. 10268-78.
United States Tax Court
T.C. Memo 1980-204; 1980 Tax Ct. Memo LEXIS 381; 40 T.C.M. (CCH) 470; T.C.M. (RIA) 80204; June 17, 1980, Filed Henry E. Nino and Elizabeth L. Nino, pro se. Catherine L. Wong, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency in petitioners' income tax for the year 1976 of $2,774. The issue for decision is whether a stipend received by petitioner Henry E. Nino while a medical fellow at the University of Minnesota qualifies for exclusion from gross income under section 117 [1] of the Internal Revenue *382 Code. [2]
FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners filed a joint Federal income tax return for the year 1976 with the Internal Revenue Service Center at Ogden, Utah. At the time the original petition herein was filed, petitioners were residents of Minneapolis, Minnesota. At the time the amended petition was filed, they resided in Los Gatos, California. [3]
Petitioner Henry E. Nino (hereinafter petitioner) graduated from St. Mary's College in California in 1966 with a bachelor of science degree. He received his *383 M.D. degree in 1970 from the University of California at Los Angeles. During 1970 and 1971, petitioner was an intern in internal medicine at George Washington University Hospital in Washington, D.C. Between 1971 and 1973, he served in the military, and then, during 1973 and 1974, he completed his residency in internal medicine at George Washington University Hospital. In 1974, petitioner applied to the University of Minnesota Graduate School for admission to the master of science degree program in neurology. Petitioner was admitted to that program and, during the years 1974 through 1977, he was a candidate for a master of science degree in neurology at the University of Minnesota. Petitioner also applied to the University of Minnesota in 1974 for a graduate fellowship and, on the basis of his admission to the graduate school to major in neurology, he was appointed a medical fellow in the Department of Neurology at the University of Minnesota Medical School for the period July 1, 1974 to June 30, 1975. He retained that position throughout the years that he was a degree candidate at the University of Minnesota. Petitioner never completed the master's degree program and never received *384 the master of science degree from the University of Minnesota. The University of Minnesota Department of Neurology's graduate education program is directed and coordinated by the University within the group of University of Minnesota Affiliated Hospitals which includes, for the neurology program, the clinical resources of the University, the University of Minnesota Hospital, Hennepin County Medical Center, St. Paul Ramsey Hospital, and the Minneapolis Veterans Administration Hospital. The funds for the program came from the University of Minnesota budget with the designated purpose of furthering the education and training of the program's participants. Prior to 1976, as a junior resident [4] in the University of Minnesota program, petitioner examined patients, wrote case histories and progress notes, and was on call at night. In 1976, petitioner was assigned to the University of Minnesota Hospital, which is run by the University and provides inpatient and out-patient services. He had three main activities there. First, he served as the chief resident in neurology. Each resident in the neurology residency program was expected to serve as chief or senior resident at one of the *385 hospitals affiliated with the University of Minnesota during his third year. [5] The chief resident in neurology at the University of Minnesota Hospital was selected by the physician who was the chief of its neurology service. The chief resident was expected to share in supervisory activities, to consult with junior residents, and to participate in the teaching of junior residents and undergradulate medical students, although not assigned any formal class schedule. *386 The chief resident in neurology was not responsible for, and did not participate in, the care of patients. Petitioner, as chief resident, chose which patients he wished to see and no notes of examinations performed by him were put into patients' charts. He did not do paperwork, such as completing Medicare or insurance forms or death notices. Prior to petitioner's term as chief resident, Dr. A. B. Baker had been the chief of the neurology service. Dr. Baker expected the chief resident to act as his liaison with patients, assuring that certain patients got special care. In 1976, Dr. Baker was replaced as chief of neurology by Dr. Joseph Rush, and petitioner was the first person to serve as chief resident of neurology under Dr. Rush. Dr. Rush did not have as many special patients as Dr. Baker had had and did not expect petitioner to function as a liasion with his patients, nor did he assign petitioner other significant duties. In 1976, the role of chief resident in neurology was not clearly defined. Petitioner was left with considerable free time, which he filled with teaching activities, taking students to see patients, and discussing cases with the students. He was expected *387 to, and did, give opinions as to diagnosis and possible therapeutic treatment of patients to other residents, but the staff physician saw each patient, performed the necessary physical and historical analysis, and made all the decisions in respect of patient treatment. Petitioner had no power to make decisions. As chief resident, he chose the patients he wanted to see on his own. Petitioner also did a considerable amount of reading in his field. Petitioner's second area of activity during 1976 was as a resident in the EEG (electroencephalogram) laboratory. Approximately five residents were present in the EEG laboratory on any day. The residents read the records of the day's tests and made notes. The following day the director of the EEG laboratory or his assistant, both of whom were EEG certified specialists and faculty members of the University of Minnesota, reviewed the tests either independently or with the residents where the records indicated that a resident had looked at them. In all cases, the director or his assistant, not a resident, would dictate and sign the final report. Petitioner was not on call at the EEG laboratory. He did not administer the tests, perform *388 physical examinations, write medical histories, make notes on patients' charts, or provide patient care. Third, petitioner served a three-month rotation period as a resident in the EMG (electromyogram) laboratory where diagnostic tests of the functioning of nerves and the physiological state of muscles were performed. Patients who came to the laboratory for diagnosis were charged for its services. Residents in the EMG laboratory would talk to a patient about his case history and sometimes perform a cursory examination immediately before the test was performed. They would then, prior to the actual test, discuss their observations with Dr. William Kennedy, the staff physician in charge of the laboratory, who would also review the patient's chart himself. The purpose of the examinations performed by the residents was to facilitate a more precise evaluation of the patients' complaints. For most of the duration of the threemonth rotation period, a resident merely observed Dr. Kennedy performing the tests. Near the end of the rotation period, the residents would be allowed to operate the machines and an exceptional resident might be allowed to take over the final step -- insertion *389 of a needle into the muscles of the patients. Dr. Kennedy interpreted the tests, made the necessary calculations, and dictated the reports. Residents were required to be present in the EMG laboratory from 8:00 a.m. to 4:30 p.m., but were not on call at night. Petitioner also attended classes, took examinations, and received grades in 1976, as a candidate for a master of science degree. While a medical fellow, petitioner was covered by the group health insurance provided to students and was not eligible for the faculty group health program. He was covered by the hospital group medical malpractice insurance policy. He was not provided with group life insurance and had no formal vacation or sick leave or retirement benefits. He was not on call for nights or weekends in 1976, although he was available by telephone for opinions.He did not get employee or faculty free parking. He was not required to participate in any research projects or to publish any papers. Petitioner received a stipend of $13,474 from the University of Minnesota in 1976. The University did not withhold Federal income tax from this stipend. Petitioner performed some administrative duties, answering phone *390 calls from outside physicians and scheduling appointments for patients, for which he was paid $252. This was not part of his stipend, and Federal income tax in the amount of $50.40 was withheld from this payment. Both the stipend and the amount paid for performing administrative duties, a total of $13,726.29, [6] were listed as "wages, tips, and other compensation" on a W-2 form issued to petitioner by the University of Minnesota. The stipend paid to a resident in neurology at the University of Minnesota was increased every year as he progressed through the program. There were individuals in the program who received no money from the University. The payments were not made on the basis of financial need. Petitioner's stipend for July 1974 through June 1975 was $9,000, $1,000 of which was paid by the Hennepin County General Hospital, to which he was assigned as a junior resident that year. *391 From July 1975 through June 1976, petitioner's stipend was $11,500. From July 1976 through December 1976, petitioner was given a stipend at an annual rate of $12,840, which, due to a cost-of-living increase, was raised to an annual rate of $13,610 for the period January 1977 through June 1977. Petitioner's stipend was designated by the University of Minnesota as a salary paid to a full-time "regular payroll employee." OPINION The issue for decision is whether $13,474 received by petitioner as a medical fellow at the University of Minnesota is excludable from gross income under section 117. Section 117(a) excludes from gross income any amount received as a scholoarship or fellowship grant. Section 117(b)(1) contains a limitation on the applicability of subsection (a) of section 117 to individuals who are candidates for degrees and an exception to that limitation. Section 117(b)(1) becomes applicable, however, only if the payment in question has first been found to constitute a scholarship or fellowship grant. Reese v. Commissioner, 45 T.C. 407, 413 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). The terms "scholarship" and "fellowship *392 grant" are not defined in the statute. Section 1.117-3(c), Income Tax Regs., defines a "fellowship grant" as amounts paid to an individual to aid him in pursuing his studies or research. The test to be applied under the regulations is whether the primary purpose for making the payments to the taxpayer was to educate and train him in his individual capacity or to compensate him for services. Section 1.117-4(c), Income Tax Regs.; Weinberg v. Commissioner, 64 T.C. 771, 776 (1975); Reese v. Commissioner, supra at 411. Section 1.117-4(c), Income Tax Regs., also provides that "any amount paid * * * to * * * an individual to enable him to pursue studies or research" shall not be considered an amount received as a scholarship or fellowship grant "if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor." In Bingler v. Johnson, 394 U.S. 741, 751 (1969), the Supreme Court sustained the validity of section 1.117-4(c) of the regulations, emphasizing that its thrust is to deny an exclusion for payments *393 given in return for a quid pro quo, as distinguished from "relatively disinterested, "no-strings' educational grants." The question of whether payments received by medical residents represent compensation for services or a scholarship or fellowship has been frequently litigated. See Weinberg v. Commissioner, 64 T.C. at 776-777 and cases cited therein. The program in which petitioner participated at the University of Minnesota, which differed from the traditional medical residency program, in that, in addition to receiving clinical training, participants were candidates for advanced degrees, has not escaped judicial attention. See Rockswold v. United States,     F.2d     (8th Cir. Apr. 8, 1980); Quast v. United States,428 F.2d 750 (8th Cir. 1970); Anderson v. United States, an unreported case ( D. Minn. 1960, 7 AFTR 2d 726, 61-1 USTC par. 9162); Rogers v. Commissioner, T.C. Memo. 1980-171; Ulvestad v. Commissioner, T.C. Memo. 1979-60; Hof v. Commissioner,T.C. Memo. 1979-55; Eckes v. Commissioner, T.C. Memo. 1978-192. See also Rosenthal v. Commissioner, 63 T.C. 454 (1975), *394 which involved a similar program at Marquette University. With one exception, the cases involving the University of Minnesota program have all held that such payments are not excludable from gross income under section 117. [7] However, as petitioner correctly assets, there are numerous differences between the facts of those cases and the facts revealed in the record herein, and each case must be resolved on the basis of its own facts and circumstances. Phillips v. Commissioner, 57 T.C. 420, 425 (1971); Zolnay v. Commissioner, 49 T.C. 389, 395 (1968). Nevertheless, such cases do serve to emphasize that, however significant the educational goals of a residency program when determining the applicability of section 117, we must focus, not on the purpose for the program, but on the purpose for the payments. Parr v. United States,469 F.2d 1156, 1158 (5th Cir. 1972); Rosenthal v. Commissioner, supra at 460. With this in mind, we turn to an examination of the facts contained in the record herein. *395 Petitioner argues that his position as chief resident was essentially a sinecure which did not require him to perform any services, that his work in the EEG and EMG laboratories was of no benefit to the University of Minnesota Hospital, and that the elements characteristic of an employer-employee relationship are lacking in this case. After a careful review of all the evidence and of petitioners' arguments, bearing in mind that the burden of proof is on petitioners, Rule 142, Tax Court Rules of Practice and Procedure, we are unable to conclude that the stipend was intended as a "no-strings" educational grant rather than compensation for services. [8]
*396 We believe petitioner's testimony that as chif resident he was not formally assigned any specific duties and that he was left with much free time. While petitioner then draws the conclusion that he was paid to study and not to work, Zolnay v. Commissioner, supra at 396, we think that the facts set forth in our Findings of Facts at pp. 5-7, supra, make it an at least equally plausible inference that it was anticipated that the chief resident would perform whatever services the department head required of him, that those services were expected to be of material benefit to the Hospital, and that, because of peculiar circumstances during a transition period, petitioner was not called upon to perform the anticipated services. The compensatory nature of his stipend is not altered by the fact that, to some extent, the services the Hospital expected to receive in exchange for the payments did not actually materialize. [9]
*397 Moreover, while petitioner seeks to minimize them, we think that he was required to and did perform certain services of value to the University and Hospital. Both petitioner's testimony and a report submitted by the University of Minnesota Affiliated Hospitals to the American Medical Association indicate that third-year residents participated in the teaching of students and first-year residents. We believe that the formal teaching sessions which petitioner conducted, in accordance with the above-described policy, must have provided a valuable service to the University and Hospital by lightening the teaching load on faculty members. We do not attach much significance to the fact that petitioner was not assigned a schedule of classes to conduct. Nor are we prepared to accept as gospel petitioner's testimony that the opinions he expressed while teaching carried no weight in determining the actual course of patient care. This testimony appears to be no more than a conclusion drawn by petitioner from the fact that the staff physician made all the decisions in respect of patient treatment.Indeed, there is reason to believe that petitioner's opinions did facilitate the examination of *398 patients, if not by the staff physician, at least by the residents who participated in patient care. Additionally, we are not convinced that petitioner's work in the EEG and EMG laboratories, even if closely supervised and duplicative of work performed by staff physicians, had no value in the operation of the Hospital. As we stated in Weinberg, v. Commissioner, 64 T.C. at 778: in providing medical treatment, the examination of the patient by several trained doctors and their views may often be of value, even though one of the doctors may have more experience than the others. Indeed, Dr. Kennedy, who supervised the EMG laboratory, stated in a letter submitted into evidence that the residents' examinations "[facilitated] a more precise examination of the patients' complaintis." [10] Even if the staff physicians could have operated their laboratories without consultation with residents, they chose not to. Fisher v. Commissioner, 56 T.C. 1201, 1214 (1971). Nor is supervision over the rendering of services incompatible with compensation for those services. Brubakken v. Commissioners, 67 T.C. 249, 257 (1976); Weinberg v. Commissioner, 64 T.C. at 779. *399 [11]
Finally, while the evidence as to the total scope of the three-year program in which petitioner participated is meager (in part, at least, because the Court -- perhaps incorrectly -- discouraged respondent from pursuing this aspect of the case on cross-examination of petitioner), we think it not without significance that there are some indications that the program as a whole involved substantial services and that it *400 is not inappropriate to infer that the stipend for the taxable year in question (which included the end of petitioner's second and the beginning of his third year in the program) may well have represented additional compensation for services rendered during the earlier part of his second year and during his first year. Cf. Koch v. Commissioner, T.C. Memo. 1979-147. See also n.5, supra. It is true that certain characteristics of employer-employee relationships which we have found indicative of payments intended as compensation in previous cases, see, e.g., Brubakken v. Commissioner,supra at 260; Proskey v. Commissioner, 51 T.C. 918, 924 (1969), are not present here; for example, the University did not withhold Federal income taxes from petitioner's stipend and petitioner was not entitled to all of the fringe benefits which faculty members received. Such factors are not, however, dispositive of the issue of the nature of petitioner's stipend. Phillips v. Commissioner, 57 T.C. at 427. The University's failure to withhold income taxes is of particularly little weight, cf. Bhalla v. Commissioner, 35 T.C. 13, 17-18 (1960), *401 in view of the fact that for administrative purposes it regarded petitioner as a "regular" full-time employee and designated his stipend a salary. See Zolnay v. Commissioner, 49 T.C. at 398. Moreover, some elements considered indicative of compensatory payments are present herein, e.g., petitioner's stipend was based on length of service, not individual need. [12] See Adams v. Commissioner, 71 T.C. 477, 487 (1978); Brubakken v. Commissioner, supra at 259. Additionally, the magnitude of petitioner's yearly stipend is, in itself, suggestive of compensation rather than a fellowship. Brubakken v. Commissioner, supra at 258; Zolnay v. Commissioner, 49 T.C. at 397. [13]
*402 Thus, although the question is not entirely free from doubt on the record before us, in light of the fact that the burden of proof is on petitioner, we conclude that his stipend was paid to him in exchange for substantial services, which he was expected to, or actually did, render, and was primarily intended to compensate him for such services. Consequently, his stipend does not qualify for exclusion from gross income under section 117 as a scholarship or followship grant. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the taxable year at issue, unless otherwise indicated. ↩
2. Adjustments of petitioners' medical expense deduction and general tax credit are dependent upon the resolution of this issue.↩
3. The document originally filed as a petition did not comply with the Rules of this Court as to the form and content of a proper petition, and an amended petition was filed pursuant to the Court's order for a proper petition.↩
4. Although the record is not completely clear on this point, we infer that the parties and the University of Minnesota intend the term "resident" to include medical fellows such as petitioner, as well as individuals pursuing the typical medical residency program, i.e., post-graduate training not leading to an advanced degree, except where a distinction is explicitly made. We follow their example and, where appropriate, employ the term "residents" to refer to petitioner and other participants in the neurology graduate program. The record is also somewhat vague with respect to whether all, or only some, of the residents in neurology at the University of Minnesota were advanced degree candidates and whether all candidates for an advanced degree in neurology were required to serve as medical fellows. ↩
5. Since petitioner was a second-year resident in the first part of 1976, we infer that his term as chief resident may have begun in the second half of 1976. His laboratory activities, described infra↩ (pp. 8-10), conform to the description of a second-year resident's duties contained in a report of the University of Minnesota Affiliated Hospitals to the American Medical Association.
6. The record does not contain an explanation of the 29-cent discrepancy. In 1976, petitioner also performed services for Eitel Hospital and Baptist Hospital for which he was separately paid. The amounts were reported by petitioner for income tax purposes and are not in dispute herein.↩
7. That exception, Anderson v. United States, an unreported case ( D. Minn. 1960, 7 AFTR 2d 726, 61-1 USTC par. 9162), was decided prior to the Supreme Court's decision in Bingler v. Johnson, 394 U.S. 741 (1969), by a jury verdict on the basis of instructions which would now be considered erroneous in part. Compare Anderson v. United States, 7 AFTR 2d at 729, 61-1 USTC at p. 79,307, with Reese v. Commissioner, 45 T.C. 407, 413 (1966), affd. per curiam 373 F.2d 742↩ (4th Cir. 1967).
8. Several letters from University of Minnesota faculty and administrators were admitted into evidence. To the extent that these letters contain conclusory statements as to whether petitioner's stipend was intended to further his education or compensate him for services rendered and whether petitioner peformed services of material benefit to the Hospital, we do not accept them as decisive of the issue before us. The University of Minnesota and its affiliated hospitals have an interest in having the payments made to their residents held to be nontaxable. See Rockswold v. United States, 471 F. Supp. 1385, 1386 n. 1 (D. Minn. 1979), affd.     E.2d     (8th Cir. Apr. 8, 1980). For the same reason, we attach no weight to the designation by the University of the budget from which petitioner was paid. See pp. 4-5, supra↩.
9. In this connection, we are not impressed by petitioner's argument that in several of the cases decided with respect to University of Minnesota programs, the residents or fellows had physical contact with the patients (e.g., surgeons), whereas in the instant situation, the patient contact was only by way of oral communications. One who rides a bicycle with or without hands is still a bicycle rider.↩
10. This letter also states that the "histories and examinations [done by a resident] are for the benefit of the physician doing the examination." In light of the further statement quoted in the text, supra,↩ we, like respondent, interpret the phrase "physician doing the examination" to mean the staff physician, and not, as petitioner would have it, the resident himself, thus indicating that the staff physician benefited from consultation with residents.
11. Petitioner relies on Burstein v. United States, an unreported report of the Trial Division of the Court of Claims (43 AFTR 2d 79-1132, 79-1 USTC par. 9354); this report, however, was recently rejected by the Court of Claims,     Ct. Cl.    ,     F.2d     (May 14, 1980)↩.
12. While petitioner stated at trial that some residents or medical fellows received no stipends, we cannot attribute much significance to this remark, since petitioner did not elaborate as to whether such individuals were required to perform the same duties as petitioner. ↩
13. Rev. Rul. 75-280, 1975-2 C.B. 47, provides that the Internal Revenue Service will assume that payments were made for the primary purpose of furthering the education and training of the recipient in his individual capacity where -- (1) the taxpayer was a candidate for a degree at an educational institution, (2) the taxpayer performed research, teaching, or other services for the institution that satisfied then existing specifically stated requirements for the degree, and (3) equivalent services were required of all candidates for the degree * * *. Although that ruling would, in any event, not be binding upon us, see Sandor v. Commissioner, 62 T.C. 469, 481-482 (1974), affd. per curiam 536 F.2d 874, (9th Cir. 1976), we again find it unnecessary to express an opinion as to its validity, see Brubakken v. Commissioner, 67 T.C. 249, 260 (1976), because we conclude that, for several reasons, it is not applicable herein. First, although the record shows that "equivalent research or teaching" was required of all neurology degree candidates, it does not show whether all candidates for the master of science degree in neurology (or only those who were also medical fellows, if such a distinction existed, see n.4, supra) were required to serve in laboratories and as chief resident. Cf. Jamieson v. Commissioner, 51 T.C. 635, 640 (1969). Second, the revenue ruling deals with section 117(b) (1), which is concerned with services in the nature of part-time employment. Petitioner was regarded by the University as a full-time employee. See Bogdan v. Commissioner, T.C. Memo. 1978-261. Third, even if the University of Minnesota Hospital at which petitioner worked is to be considered part of the educational institution granting his degree, it was not required that all degree candidates provide equivalent services, i.e., services for the University of Minnesota, since other individuals were assigned to different hospitals. It would be anomalous if, merely because petitioner was chosen to serve his chief residence at the University of Minnesota Hospital, rather than any of the other hospitals to which he could have been assigned adn whose status as educational institutions within the meaning of the ruling is doubtful (see Bodgan v. Commissioner, supra↩), his stipend would not be includable in gross income.